*In re* MARRIAGE OF HARRY BROOKS, Plaintiff and Counterdefendant-Appellant, and MAUREEN BROOKS, Defendant and Counterplaintiff-Appellee (Elaine Coopersmith Brooks, Counterdefendant-Appellant).

First District (1st Division) No. 84—1467

Opinion filed October 28, 1985.—Modified on denial of rehearing December 9, 1985.

William J. Judge, of Feiwell, Galper, Lasky & Berger, Ltd., of Chicago, for appellant Harry Brooks.

John P. Biestek & Associates, Ltd., of Arlington Heights (Edward A. Scott III, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

On October 26, 1978, a bifurcated judgment was entered dissolving the marriage of plaintiff Harry Brooks and defendant Maureen Brooks, reserving questions of maintenance and property division. More than five years later, the court entered a supplemental judgment disposing of the parties' marital property and awarding defendant maintenance. Plaintiff's motion for reconsideration of the supplemental judgment was denied by the court. Plaintiff appeals the supplemental judgment and the denial of his motion or reconsideration. For the following reasons, we affirm.

The parties were married on July 15, 1950, and had three children during the marriage, all of whom were emancipated at the time the judgment for dissolution was entered. In 1965, after 15 years of marriage, the parties, without court order, ceased living together as husband and wife. On December 2, 1978, approximately two months after the entry of the dissolution judgment, Harry married Elaine Coopersmith. In June 1983, Elaine was impleaded as an additional counterdefendant in these proceedings.

The matters of property division and maintenance proceeded to trial in November 1982. At that time, Maureen was 65 years old and living in an apartment in suburban Palatine. On the date of dissolution she had been employed as a bookkeeper/secretary at Arlington Steel in Arlington Heights. By 1980, her annual salary at Arlington Steel had increased to approximately $18,000. She remained employed until 1980, when she suffered the first of three strokes.

Dr. Richard Treanor, Maureen's treating physician, testified at length regarding Maureen's health. He stated that as a result of her strokes, Maureen suffered facial paralysis and lost part of her vision on the right side of her visual field. Maureen additionally suffers from diabetes and high blood pressure. The effects of her strokes, diabetes and high blood pressure include dizziness, confusion, memory loss and poor vision. He opined that the diabetes and poor vision were permanent conditions. Her ability to function on a daily basis is impaired. She cannot drive or read, and her required insulin could cause short term episodes of paralysis, lasting a few minutes or as much as 24 hours, and could cause another stroke. Dr. Treanor told Maureen she could not work.

Following her strokes, Maureen received $380 per month in social security payments and $195 per week as temporary support from Harry. She has no other income or savings. An affidavit prepared by the parties' daughter listed Maureen's monthly expenses as $1,618, and her personal debts as $9,366. Maureen testified she could not afford to have the home nursing service recommended by her doctor.

Harry was 58 years old at the time of the hearing on the property division. He was founder and president of Excellent Builders, Inc., and president of Baythorn Development, Inc., and Tampa Chicken, Inc. Excellent Builders was formed in 1966, Baythorn in 1978, and Tampa Chicken in 1980. Harry's testimony indicated he only received an income from Excellent Builders. He stated that as president of Excellent he had sole control over the amount of his salary, which currently was $900 per week as of July 6, 1983. Harry stated he earned $156,000 in 1976, $123,000 in 1977 and $87,000 in 1978. As president of Excellent Builders, he also received medical and life insurance, membership in a country club, entertainment expenses, an American Express account and a Mercedes 450 SL automobile.

Harry testified he owns the North Kedzie Avenue building which houses Excellent Builders. He purchased the building in August 1977 for $95,000, with a mortgage of $88,000. He leases the building to Excellent Builders for $1,125 per month.

Harry also owned a number of residential properties, including Units 20E and 22A at 3900 North Lake Shore Drive in Chicago. In January 1978, Harry purchased Unit 20E for $39,000, providing a down payment of approximately $8,000. Five months later he assigned his interest in the unit to the parties' son and daughter-in-law, notwithstanding a court order preventing the parties from disposing of any assets. In August 1981, the son was divorced, and he and Harry became owners of Unit 20E, each with a 50% beneficial interest in the

land trust holding title to the unit. The unit was sold in June 1983.

Unit 22A was purchased for $62,500 in January 1978. Harry testified that he and Elaine each put $6,000 down on the unit and that they co-signed a mortgage for the remainder. The unit was sold in July 1981 for $120,000. The proceeds from the sale were used for the down payment on a $116,000 townhouse in Highland Park. Harry and Elaine currently reside in the townhouse.

Additionally, in 1979 Harry and Elaine purchased a Florida condominium for $98,000. Title was transferred in 1981 to Elaine alone. In August 1982, the condominium was sold for $135,000.

William Coscioni, a certified public accountant, testified on Maureen's behalf concerning Harry's finances. Coscioni examined income tax returns, loan documents, stock transactions and other records for Excellent Builders from the years 1977 through 1981. His examination also included bank accounts, financial statements and the individual tax returns of Harry and Elaine for the years 1976 to 1982. Based on his examination, Coscioni testified that Harry's "real" or disposable income was as follows: $102,869 in 1978; $167,272 in 1979; $82,533 in 1980; $101,222 in 1981; and $91,300 in 1982.

Coscioni also stated that Harry's actual salary from Excellent Builders dropped from $128,000 in 1977 to an estimated $55,000 in 1982. However, concurrent with Harry's salary decline was a corresponding increase in loans to him from Excellent. As a result, Harry's "real income" actually remained fairly consistent from 1976 through 1981. The only exception was in 1979, when Harry's real income was $167,272. In that year, Harry received Las Vegas gambling winnings of $50,000, an automobile valued at $7,000 as a prize, a tax refund of $26,000 and a $10,000 increase in his loan account from Excellent Builders. Harry did not report his gambling winnings on his tax return, nor pay any tax on the money.

Coscioni further testified that the value of Excellent Builders on the date of dissolution was $259,000 and that its current value is $359,000. His valuation was based on several factors, including Harry's personal financial statement dated August 15, 1978, admitted into evidence by stipulation. The financial statement had been submitted by Harry to Continental Bank to secure a loan.

Coscioni also testified that Harry's assets as of October 31, 1982, totalled slightly more than $2,000,000. This calculation included the following: small amounts of cash, marketable securities worth $38,000, nonmarketable securities valued at $104,000, stock in Excellent Builders valued at $359,000, parcels of real estate in suburban Flossmoor (Baythorn Development), the Kedzie Avenue building housing Excellent

Builders, the Highland Park townhouse, a condominium on Lake Shore Drive and personal property valued at approximately $25,000.

Coscioni found the following liabilities existing as of October 31, 1982: miscellaneous bills and accounts, stock market accounts of approximately $16,000, personal loans at Continental Bank of $115,000 and at Pioneer Bank of $33,000, loans relating to certain real estate including the Flossmoor properties with mortgages of $1,175,000, a first mortgage of $80,000 on the office building housing Excellent Builders, a first mortgage of $55,000 on the Highland Park condominium, and a first mortgage of $38,000 on the Lake Shore Drive condominium. Harry's total liabilities amounted to $1,500,000, with a resulting personal net worth in 1983 of approximately $500,000.

Testifying on Harry's behalf was Jay Colbert, a certified public accountant, who had worked for Harry since 1978. Colbert stated that because of the loan structure of Excellent Builders and Baythorn Development, and because of Harry's personal guarantees of that structure, Harry's financial condition was "very precarious." He testified that should the banks "call the loans," Harry and Excellent Builders "would be out of business." Moreover, if Excellent would be unable to cover the loans, in Colbert's opinion, the banks would seek relief from Harry, as guarantor. Colbert also testified that Baythorn Development was an "inert corporation ***, not dissolved but not doing business" with no real assets.

Loan officers from three lending institutions testified at the hearing. Thomas Przyborski of Security Federal Savings & Loan testified that Baythorn Development was then $842,229 in default on four loans made to the company between September 1978 and July 1979, and that foreclosure proceedings had been initiated. However, Harry's witness, Jay Colbert, later testified that the Security Federal loan obligation had been extinguished by a deed in lieu of foreclosure. James Lucansky of the Associate's Financial Institute stated that four loans made to Baythorn Development and guaranteed by Harry as president of Baythorn were then in default. The outstanding amount of principal and interest was $1,556,000. Lucansky testified that the loans were secured by collateral and that no action had been taken to collect the funds. Finally, Cecelia Kurtzweil of Continental Bank testified that there was an outstanding balance of $409,142 on a $338,000 loan which was made to Excellent Builders in February 1980 and was guaranteed by Harry as president of Excellent. She also stated that a balance of $102,686 remained on a loan to an individual named Steven Jacobson which Harry took out in August 1978, and a balance of $21,047 remained on a loan Harry took out for himself in November 1977.

In November 1983, the trial court made its oral pronouncement of its findings as to property division and maintenance. Three months later, the court entered a written supplemental judgment directing that the marital assets be divided 50/50 between the parties and that this division be based on the value of the assets at the time of dissolution, which the court found to be $460,000. The court awarded Maureen $230,000 in lieu of any interest she had in any of the properties. The $230,000 was to be paid by Harry in annual installments over 17 years without any interest on the unpaid balance. The court further awarded Maureen $225 per week as maintenance, reviewable every 36 months, and awarded $25,180 in attorney fees and costs to Maureen's attorneys. Harry was ordered to pay $21,000 of the fee award.

Harry subsequently filed a motion for reconsideration of the supplemental judgment, which was denied by the court.

I

 On appeal, Harry first argues that the trial court abused its discretion in classifying the following assets as marital: Excellent Builders, the Kedzie Avenue building in which Excellent is located, condominium Unit 20E on Lake Shore Drive, miscellaneous stocks, Baythorn Development, the Nyvatex Oil Company lease and the 1976 tax refund of $26,000.

In Illinois, all property acquired during the marriage is presumed marital unless excepted by statute. (Ill. Rev. Stat. 1983, ch. 40, pars. 503(a), (b).) The burden is on the party seeking to rebut this presumption to prove by clear evidence that the property is statutorily excepted. (*In re Marriage of Cook* (1983), 117 Ill. App. 3d 844, 453 N.E.2d 1357.) Here, Harry contends that each of the above assets were acquired either after the judgment of dissolution or after the date of the parties' actual physical separation on March 10, 1965. After carefully reviewing the record, we have found no evidence that any of the assets which the court found to be marital were acquired subsequent to the date of the dissolution in October 1978. Harry's suggestion that the date of the parties' separation should be used as the termination date of Maureen's marital property rights is baseless. For us to hold that a *de facto* termination extinguishes marital property rights would create, in effect, "common law divorce." Law and policy will not support such a result.

II

Harry next argues that the valuation and distribution of the marital assets were erroneous. Specifically, he urges that the trial court

erred in valuing Excellent Builders and Baythorn Development, and in determining his personal net worth. He also contends that the court, in distributing the marital property, failed to consider his current economic circumstances. He urges that the testimony of his accountant establishes that he would be hard pressed to meet the property division ordered by the court due to certain existing loan obligations.

■ Section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) requires that the court shall divide marital property in "just proportions." (Ill. Rev. Stat. 1981, ch. 40, par. 503(c).) To apportion marital assets under section 503(c), the value of such assets must first be established. (*In re Marriage of Melnick* (1984), 127 Ill. App. 3d 102, 468 N.E.2d 490.) Testimony concerning the valuation of assets in an action for dissolution of marriage are matters to be resolved by the trier of fact, and as long as the court's valuation is within the range testified to by the expert witnesses, it ordinarily will not be disturbed on appeal. *In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904, 466 N.E.2d 925.

It is further established, as Harry acknowledges in his brief, that the date of valuing marital assets is the date the judgment of dissolution was entered. (*In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 446 N.E.2d 1198.) In *Rossi*, as in this case, a substantial period of time elapsed between the entry of the judgment of dissolution and the resolution of issues of property division and maintenance. Specifically, in that case approximately 2½ years elapsed. On appeal, the respondent argued that the court erred in valuing one of the marital assets, a closely held corporation, as of the date of dissolution. There was evidence indicating that the corporation had increased in value subsequent to that date. This court held that the date of dissolution was the proper date of valuation, reasoning that "[t]o hold otherwise would have the effect of treating appreciation of the corporation subsequent to the dissolution as marital property contrary to section 503(c)(3) of the Act." Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(3); accord, *In re Marriage of Frazier* (1984), 125 Ill. App. 3d 473, 466 N.E.2d 290.

■ With the foregoing principles in mind we turn to Harry's objections, the first of which is that the trial court erred in valuing Excellent Builders at $250,000. We disagree and find ample support for the court's valuation. William Coscioni, a certified public accountant called as a witness by Maureen, testified that based on his extensive review of various financial records of Harry and Excellent Builders he determined that Excellent Builders had a value of $259,000 on October 26, 1978, the date the judgment of dissolution was entered. Coscioni testified that in his valuation of the company, he considered factors of capi-

tal structure, indebtedness and liability in accordance with Revenue Ruling 59—60. (Rev. Rul. 59—60, 1959—1 C.B. 237.) The record before us reveals no opinion by Harry's expert witness as to the value of Excellent Builders on the date of dissolution. Coscioni's valuation, however, was identical to Harry's own valuation which appeared in a sworn financial statement, dated August 15, 1978, that Harry submitted to Continental Bank to secure a loan. This statement was admitted into evidence pursuant to stipulation of the parties.

■ Harry asserts that the above valuation is inaccurate because it failed to take into account "certain current and contingent liabilities" of Excellent Builders. Harry fails to identify in his brief which liabilities he is referring to. However, from the pages of the record cited in support of his argument, it is apparent that he is referring to the following two obligations: (1) a $338,000 loan to Excellent Builders from Continental Bank, and (2) a $100,000 second mortgage on the property housing Excellent Builders given to employee Gilbert Connolly to secure an amount due him. With regard to the Continental Bank loan, the record discloses that it was not entered into until February 1980, which was subsequent to the date of dissolution. As such, for us to permit this loan to affect the value of Excellent Builders would violate our holding in *Rossi*. With respect to the $100,000 second mortgage, the record shows that it also was not executed until after the date of dissolution. This fact was gleaned from the testimony of Phillip Wolin, an attorney who handled the business affairs of Harry and Excellent Builders.

■ Harry further argues that the court erred in including among his personal assets the entire value of Excellent Builders. He asserts in his brief that "there was no dispute that Harry owned only 85% of the stock of Excellent Builders." This assertion belies the record. The testimony of William Coscioni demonstrated that the transfer of 15% of the company stock to employee Gilbert Connolly in 1975 was not bona fide. Coscioni testified that his examination of the books and records of Excellent Builders revealed that the stated price for the stock was $45,000. A $2,000 down payment was made and a $43,000 note signed. Two $5,000 payments were made, but thereafter $5,000 was refunded to Connolly. No interest had been paid on the note. Given these facts and circumstances, we believe that the court was justified in relying on Coscioni's conclusion that 100% of the stock should be included in Harry's personal financial estate.

■ Harry contends next that the court erred in valuing Baythorn Development at $18,500, in view of the testimony of his accountant, Jay Colbert, who had prepared the corporate accounts of Baythorn

since 1978. Colbert testified that in his opinion Baythorn Development was an "inert corporation" and of "no real value." He stated that any assets which Baythorn Development owned were deeded to one of its creditors, Security Federal, in lieu of a foreclosure action.

From the record before us, it is unclear precisely how the trial court determined the value of Baythorn Development to be $18,500. We were unable to find any expert testimony providing this valuation. Even assuming, however, that the valuation of $18,500 was incorrect, there is no need for reversal of this cause. We note that the $18,500 is more than offset by the court's failure to include as part of the net value of the marital estate a $26,000 income tax refund that Harry received from the parties' 1976 Federal income tax return. The right to this refund accrued during the parties' marriage, and thus the refund should have been treated as marital property. The trial court, although recognizing that the refund Harry received was a marital asset, failed to include the refund in the $460,000 net value of the marital estate which it determined should be evenly divided between the parties.

■ Harry next alleges that the court erred in valuing his interest in Lake Shore Drive condominium Unit 22A. The record reveals that the court stated that the unit was marital, but that Elaine also had an interest in it. The value the court placed on Unit 22A was a combined equity with Lake Shore Drive Unit 20E of $43,000. We find this value to be excessive. The record reveals that both condominium units were purchased shortly before the date of dissolution. Harry testified that Unit 22A was purchased in 1977 for $62,500 and that he and Elaine each put down approximately $6,000. Harry and Elaine co-signed the mortgage in the amount of $50,000. In January 1978, Harry purchased Unit 20E for $39,000, providing a down payment of approximately $8,000 and obtaining a mortgage for the remainder. Under these circumstances, the value of Harry's combined equity in Units 22A and 20E on the date of dissolution was closer to $14,000, rather than $43,000.

Although the court made the above relatively minor errors in valuing certain marital assets, such errors clearly do not require this court to disturb the property award. The record reveals that the trial court carefully reviewed the evidence adduced at trial and had a good understanding of this case, which had been complicated by the passage of time occurring between the initial judgment and the property division. The court attempted to accommodate both parties' needs. It determined that an equitable distribution in this case would be a 50/50 division of the $460,000 net value of the marital assets existing as of October 26, 1978, the date of dissolution. We recognize that with the errors

in valuation discussed above, Maureen's share appears to be slightly more than 50% of the marital estate, assuming that the property values not challenged on appeal are correct. It is held, however, that in dividing marital property under the Act, the court need not make an equal division of marital property. (*In re Marriage of Borg* (1981), 96 Ill. App. 3d 282, 421 N.E.2d 214.) It is further established that the apportionment of property by the trial court will not be disturbed in the absence of an abuse of discretion; the court's discretion is abused only if no reasonable person would take the view of the trial court. 96 Ill. App. 3d 282, 287.

In the present case, we cannot find an abuse of discretion. We note that the court, in apportioning the marital property, was required under section 503(c) of the Act to consider all relevant factors including the respective economic circumstances of each spouse; the age, health, station, occupation, amount and sources of income, and employability of each party; and the reasonable opportunity of each spouse for future acquisition of capital assets and income. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c).) In evaluating these factors, the court was required to take into account the severe physical handicaps plaguing Maureen even though they developed subsequent to the date of dissolution. (*In re Marriage of Fuggiti* (1985), 130 Ill. App. 3d 190, 474 N.E.2d 386; *In re Marriage of Clearman* (1981), 97 Ill. App. 3d 641, 423 N.E.2d 283, *appeal denied* (1981), 85 Ill. 2d 564.) In *Fuggiti* and *Clearman*, the trial court initially awarded the wife a greater portion of the marital property than the husband. This court reversed the disposition and determined that the assets should be more justly apportioned. Upon remand, the trial court took additional evidence and found that, in the interim, the wife had become seriously ill. The trial court then entered substantially the same disposition of property. On appeal, this court affirmed the actions of the trial court and upheld the property disposition because of the extraordinary circumstances which had arisen after the remanding order.

Hence, it is clear that under *Fuggiti* and *Clearman*, the trial court, in determining the property settlement, is to consider the health and economic circumstances of the parties that currently exist. Here, the record shows that at the time of the hearing on property division, Maureen was in her mid-sixties and a virtual invalid. She had suffered a series of strokes beginning in 1980, and was diabetic and hypertensive. As a result, her treating physician testified she could not drive nor read, and could no longer work. Her yearly income was $14,700, consisting of $380 per month social security and $195 per week from Harry. She had no assets, pension or medical or hospitalization insur-

ance, and had debts of $9,366. Harry, on the other hand, was 58 years old and was employed as president of Excellent Builders, his own company. He was in good health, married, and resided in a townhouse in the affluent suburb of Highland Park. As president of his company, he was able to drive a Mercedes and enjoyed a country club membership. Furthermore, as the trial court found, the evidence showed that Harry's yearly salary in 1982 was $55,000, but his "real income" was actually in excess of $91,000.

In light of the above facts and circumstances, the trial court was eminently fair to Harry. The court ordered that he pay Maureen $230,000 for her share of the marital estate in installments over 17 years, rather than in a lump sum. No interest was ordered on the unpaid balance. In awarding Maureen her interest in the marital estate in this manner, the court obviously was cognizant of our decision in *In re Marriage of Rimmele* (1981), 102 Ill. App. 3d 88, 429 N.E.2d 879. There, we held that this type of installment payment is ordinarily improper particularly where, as here, the wife is in poor health and owns no other assets. In this case, however, the court apparently made an exception for Harry in view of his accountant's testimony that he may have difficulty complying with the property division because he had guaranteed certain loans for his businesses. The court, in extending to Harry in effect a long-term interest free loan, certainly cannot be deemed to have treated him unfairly. In fact, when the amount awarded Maureen is reduced to its present cash value, it would probably be considerably less than 50% of the marital assets. Accordingly, we refuse to set aside the court's distribution of the marital property.

### III

■■ Harry further argues that the court abused its discretion in awarding Maureen maintenance. It is unclear whether Harry is disputing the award itself or merely its amount. At trial, however, Harry's attorney acknowledged in closing argument that an award of maintenance would be proper. He stated:

> "We are not suggesting he pay nothing. We are suggesting that he, if possible, obtain a reduction in the amount he has been paying *** and that it be limited in time."

Hence, the propriety of an award of maintenance was conceded at trial and the issue therefore cannot be raised for the first time on appeal. *In re Marriage of Garrison* (1981), 99 Ill. App. 3d 717, 425 N.E.2d 518.

■■ We next consider the propriety of the amount and duration of the maintenance award in this case. Section 504 of the Act provides that the court is to consider the following factors in determining the

maintenance award:

"(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties; and

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance." (Ill. Rev. Stat. 1983, ch. 40, par. 504.)

The amount and duration of a maintenance award lies within the discretion of the trial court, for whose judgment we will not substitute our own absent an abuse of discretion which occurs "only where no reasonable man would take the view adopted by the trial court." *In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 508, 436 N.E.2d 228.

■■ Here, Harry notes that on the date of dissolution in 1978 Maureen was employed, earning $18,000 per year, with "no known physical maladies." He contends that because the trial court determined that the date of dissolution was the proper date of determining inclusion of assets in the marital estate and the values to be included, it likewise should have based its award of maintenance on Maureen's needs as they existed on October 26, 1978. In support of his argument, he cites *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 397 N.E.2d 488. Harry, however, has mischaracterized the holding in *Olsher*. That case holds only that property rights and support issues are interrelated and should be determined in conjunction with, and in light of, each other. *Olsher* does not provide that the valuation date of the property must be the evaluation date of the propriety and amount of maintenance.

It is clear that, contrary to Harry's assertion, the court was required to consider the parties' health and economic circumstances as they existed when the court ruled on the maintenance award. (*In re Marriage of Fuggiti* (1985), 130 Ill. App. 3d 190, 474 N.E.2d 386; *In re Marriage of Clearman* (1981), 97 Ill. App. 3d 641, 423 N.E.2d 283, *appeal denied* (1981), 85 Ill. 2d 564.) Given the circumstances of the parties existing at that time, we believe that the court's award of $225

per week maintenance, reviewable every 36 months, is not an abuse of discretion. We note that Harry paid Maureen voluntary support of $185 per week for approximately 12 years beginning in 1965. In October 1977, a temporary support order was entered in the same amount. On July 18, 1978, by order of court, the temporary support was increased to $195 per week. Under the judgment of dissolution, Maureen was awarded an increase of $30 per week, or $1,560 per year. Certainly, no serious contention can be made that such an increase is an abuse of discretion. It is only slightly more than Harry voluntarily paid Maureen when she was healthy, employed and earning a reasonable salary. As such, we are unconvinced that the court's award of maintenance should be disturbed.

## IV

Harry next argues that the trial court erred in ordering him to pay $21,000 of Maureen's attorney fees. He raises no question as to the reasonableness of the fee award, but challenges only the amount of his contribution.

■■ It is well established that the allowance of attorney fees rests within the sound discretion of the trial court and such an award will not be reversed unless the trial court has clearly abused its discretion. (*In re Marriage of Yakin* (1982), 107 Ill. App. 3d 1103, 1117, 436 N.E.2d 573.) To justify an allowance of attorney fees, the party seeking the relief must show financial inability to pay and the ability of the other party to do so. (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 581, 373 N.E.2d 576.) It is not necessary for a party to be destitute to justify an award of fees. (*In re Marriage of Yakin* (1982), 107 Ill. App. 3d 1103, 1118, 436 N.E.2d 573.) A former wife is not required to exhaust her limited resources to pay her attorney fees. *In re Marriage of Cleveland* (1981), 99 Ill. App. 3d 293, 301, 425 N.E.2d 475.

■■ Here, Maureen's financial circumstances are meager, at best, with no prospects for future growth as a result of her health problems and age. Harry's circumstances are otherwise. Maureen's attorney fees are well in excess of one year of her gross income. To require her to make such a payment would be grossly unfair. We therefore find no abuse of discretion as to the fee award.

## V

■■ Finally, Harry contends that the trial court erroneously denied his motion to reconsider the February 9, 1984, supplemental judgment because it did not precisely conform to the court's oral pronouncement. This argument must fail. It is clear under Illinois law that

the written judgment is the order and decision of the court and not the oral pronouncement. In *In re Marriage of Roberts* (1980), 84 Ill. App. 3d 538, 541, 406 N.E.2d 1, this court stated:

"If a written judgment is to be submitted to the trial judge for his signature, it becomes final 'only when the signed judgment is filed' (Ill. Rev. Stat. 1977, ch. 110A, par. 272), and a notice of appeal filed before that time is premature * * *."

Oral pronouncements are not final, binding or appealable. As such, prior to the filing of the signed judgment, the court is free, upon its own motion, or that of any party, to alter its oral pronouncements. Only the signed judgment embodies the final and binding decision of the court.

■■■ Finally, we note that Harry and Elaine filed with this court an emergency motion to extinguish certain liens and other restrictions impressed on their assets by the trial court in its supplemental judgment. The restrictions were impressed to secure the $230,000 due and owing to Maureen. Harry and Elaine asserted in their motion that the liens and other restrictions effectively prevent Harry from freely running Excellent Builders. On July 17, 1984, this court ordered that all liens or security imposed by the supplemental judgment were extinguished until further order of court. We additionally ordered that Harry "deposit and pledge as collateral security for the payments ordered by said supplemental judgment all of his capital stock in Excellent Builders, Inc.," with Maureen's attorneys, with their authority to sell same, with reasonable notice, upon Harry's nonperformance of the judgment. We hereby modify the supplemental judgment and hold that our order of July 17, 1984, is to remain in effect until the satisfaction of the $230,000 judgment awarded to Maureen.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed, as modified.

Affirmed, as modified.

CAMPBELL and O'CONNOR, JJ., concur.