*In re* MARRIAGE OF CAROL A. BENKENDORF, Petitioner-Appellee, and RICHARD C. BENKENDORF, Respondent-Appellant.

First District (5th Division)   Nos. 1—91—2736, 1—91—3811 cons.

Opinion filed August 13, 1993.

Paul J. Bargiel, P.C., of Chicago, for appellant.

Mammas & Goldberg, Ltd., and George S. Feiwell, P.C., both of Chicago (Jerry S. Goldberg and Evan James Mammas, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Richard C. Benkendorf (Richard) appeals from portions of a judgment for dissolution of marriage and an order of child support.

Richard presents the following issues for review: (1) whether the trial court's decision to award 60% of the marital property to the wife and 40% to the husband was against the manifest weight of the evidence; (2) assuming *arguendo* that the division of property is reasonable, whether the husband received less than 40% due to errors in valuation made by the trial court; (3) whether the trial court failed to consider the effect of liabilities assigned to the husband; (4) whether the trial court erred in refusing to permit evidence of valuation contemporaneous with the entry of judgment for dissolution of marriage; (5) whether the trial court's child support order should be reversed; and (6) whether the trial court abused its discretion in ordering the minor children to attend Elgin Academy and requiring the husband to pay a portion of their educational expenses there.

On January 26, 1988, Carol A. Benkendorf (Carol), filed a petition for dissolution of marriage. Nine children were born to the parties during the marriage, and at the time of the dissolution three were under the age of 18.

Richard was 52 years old at the time of trial. He had a bachelor's degree from Notre Dame University. After he graduated college he was employed by IBM for approximately 16 years. After he left IBM, he was employed by a series of companies which culminated in his most recent employment with Ameritech. At Ameritech he was a small division vice-president from 1989 until he was terminated on October 19, 1990. Richard's annual salary at Ameritech was $135,000 plus bonus. The president of Ameritech testified that Richard's employment at Ameritech was terminated; he did not leave voluntarily.

At the time of trial Carol was 50 years old. She received a bachelor's degree in biology and chemistry from St. Mary's College, Notre Dame, Indiana, in 1961; a master's degree from the University of Michigan in 1975 and a doctorate degree from Michigan in 1978. Currently she works as a consultant. She owns interests in three corporations she formed. They are Toxicology Data Services (100%), Tox Data Systems (50%), and Hazard Communication Resources (80%).

She earned approximately $39,000 in 1985, $40,000 in 1986, and $31,500 in 1987 from Toxicology Data Services. Earlier in the marriage when the parties lived in Michigan she was employed at Ford Motor Company. She earned $18,000 per year when she began working at Ford and was earning $30,000 a year when the parties left Michigan to come to Chicago.

The record reveals that the parties accumulated a marital estate having an approximate value of $2 million.

Carol has nonmarital property with a value of $223,529. In addition, she is a lifetime income beneficiary of two trusts set up by her mother and father. Carol can ask the trustee to invade the principal for "her care, maintenance, medical needs, comfort, support, and general welfare" and "for her to provide for the needs of any of her children who are dependent upon her for their support." However, upon Carol's death, the trust corpus is to be divided equally among her nine children. The right to the income from the aforementioned trusts is also Carol's nonmarital property.

On May 2 and 6, 1991, the trial court made its oral pronouncement that it would divide the marital property 60/40 in favor of the wife; that there would be no maintenance for either party; that two of the children, Sharon and Matthew, would attend Elgin Academy; and that it would take up the issue of support and educational expenses at a future hearing. The trial court also stated orally on May 17, 1991, that it would employ the "last trial date" which was December 6, 1990, as the date of valuation of the assets. The written judgment for dissolution of marriage was entered on July 9, 1991.

I

Richard argues that the division of marital property, 60% to the wife and 40% to the husband, is an abuse of discretion and against the manifest weight of the evidence under the circumstances of this case.

The distribution of marital assets is within the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a clear abuse of discretion. (*In re Marriage of Bush* (1991), 209 Ill. App. 3d 671, 677, 567 N.E.2d 1078.) It is a well-established rule that a reviewing court is not justified in substituting its judgment for that of the trial court. (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126.) However, a reviewing court must reverse if it determines that the trial court acted arbitrarily and without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized princi-

ples of law so that substantial injustice resulted. *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 180, 478 N.E.2d 1068, 1076.

Pursuant to section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 503(d)), the trial court has broad discretion to apportion marital property in "just proportions," and that discretion is abused only when no reasonable person would take the view adopted by the court. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 383, 559 N.E.2d 56, 61.) The trial court is not required by statute to divide the property with mathematical equality. (*In re Marriage of Ligas* (1982), 110 Ill. App. 3d 1, 441 N.E.2d 1277.) Although the trial court must consider all relevant factors under section 503(d), it need not make specific findings as to each relevant factor. (*In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 518 N.E.2d 1316.) The value of the parties' nonmarital assets is a factor to be considered in the division of marital property. (*In re Marriage of Deem* (1984), 123 Ill. App. 3d 1019, 463 N.E.2d 1317.) In distributing the marital estate, the court should seek to place the parties in a position from which they can begin anew, in addition to providing adequate support for the children. *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126.

■ We believe the record reflects that the trial judge considered all the appropriate factors in determining the distribution of the marital estate, including the value of Carol's nonmarital property. We are unable to find that no reasonable person would take the view adopted by the trial court and find that the trial court did not abuse its discretion in ordering a 60/40 split of the marital property in the present case. Accordingly, we affirm the trial court's decision to divide the marital property 60% to Carol and 40% to Richard.

## II

Richard argues that due to errors in valuation of the marital home, various insurance policies, the Acerbee pension fund, the Limousine Financial note and an OTC account, he actually received less than 40% of the marital property.

### MARITAL HOME

At trial, Carol indicated to the court that she wished to receive the marital home as a portion of her division of the marital property. Richard did not object to Carol's receiving the marital home. However, the parties dispute the value placed on the home in the distribution of assets.

The trial court valued the marital home located in Barrington at $731,700 in the judgment for dissolution of marriage. The home had a stipulated value of $1,100,000, and after the outstanding mortgage was deducted from the stipulated fair market value, the home had a net equity of $813,000. Carol's attorneys argued to the trial court that the net equity value of the house should be reduced by the costs of a sale because the wife might have to sell the house if she was unable to support it, in which event she would incur capital gains tax, closing costs, and repair expenses. The trial court accepted the wife's argument that the net equity value of the house should be reduced by those items and "took 10% off as a way of resolving [the] dispute." According to the trial court, the value of the marital home is "$813,000 minus ten percent," or $731,700.

Richard argues that the trial court erred in reducing the net equity value of the marital home by 10% from $813,000 to $731,700 because of the costs of a theoretical sale since no sale was made necessary by the judgment for dissolution entered in this case. We agree.

Carol argues that the trial court's valuation of the marital home did not include a reduction on account of taxes and that all that must appear is that the transaction "was made necessary by reason of the judgment." (*In re Marriage of Emken* (1981), 86 Ill. 2d 164, 427 N.E.2d 125.) Carol states in her brief:

> "CAROL's share of the marital estate is $1,200,738.00, $731,700.00 (60.9%) of which is the marital home. If CAROL can afford to retain the home until her minor children have reached majority—an assumption that is by no means certain since she is receiving no maintenance and RICHARD is also appealing the award of *any* child support—the home will certainly have to be sold then. Given the relatively large portion of the allocation to CAROL represented by the marital home, the trial court properly did not put on blinders as to the real and necessary consequences of its allocation." (Emphasis in original.)

In discussing whether or not Carol would keep the house, the trial court indicated: "Let's suppose we *** reduce the net price by roughly $80,000 for costs of sale if it were sold." The trial court subsequently asked Carol if taking costs of sale off the net price of the house would make the house more viable to keep. Carol responded yes. Ultimately, the trial court stated:

> "What I am trying to do *** [w]as take ten percent off the top, six percent of what are the costs of the brokerage commission. *** If you get down with the other percentages, what are attorney's fees, there are other attorney's fees involved in a sale.

There are title charges involved and other costs, documentary stamps, etcetera, in a sale. I took a figure of 10% off as an equitable way of resolving a dispute, that's all. *** The value is 813 minus ten percent."

■ The record reflects that during discussion regarding the marital home, both the trial court and Richard offered that the house could be sold in order that any costs of the sale and any capital gains tax could be incorporated into the distribution of property, or taken off the proceeds of the sale before the proceeds were distributed to the parties. An order to sell the house would have eliminated any speculation as to the financial consequences of such a sale. Nevertheless, Carol chose to receive the house as a portion of her distribution of property. Since it was Carol's choice to receive the house as 60.9% of her share of the marital estate, we do not believe Richard should be penalized by that choice.

"While a court should take into consideration tax consequences resulting from a sale of property made necessary by the court's judgment in a dissolution case [citations], the court should not speculate as to the existence and amount of future tax liabilities when no such sale is contemplated by the parties or required by the court's division of property. [Citations.]" (*In re Marriage of Hawkins* (1987), 160 Ill. App. 3d 71, 79, 513 N.E.2d 143, 148.) There is no evidence in the record that Carol intended to sell the home, and there was nothing in the judgment requiring her to do so. In fact, as of the date of oral argument, Carol was still living in the marital home. We believe the trial court's comments on this issue indicate that it was reducing the value of the home so as to avoid a sale, as opposed to reducing the value of the house by the costs of a sale that was required by the judgment. We find it was improper for the trial court to consider speculative tax implications from a hypothetical sale of the marital home to reduce the valuation of the home. (See *In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 509, 436 N.E.2d 228, 233.) We find that the trial court's erroneous reduction of the value of the marital home resulted in the undervaluation of the marital home by $81,300 ($813,000 x 10% = $81,300. $813,000 - $81,300 = $731,700). Based on the trial court's 60/40 division of property, we find that Richard was deprived of 40% of $81,300, or $32,500. We remand this matter to the trial court with directions to order Carol to reimburse Richard $32,500 as a result of the erroneous reduction in value of the marital home.

## INSURANCE POLICIES

Richard points out that the trial court listed and valued several

life insurance policies owned by the parties and the cash values of said policies. Richard has no objection to the trial court's valuation, but objects that the policies were not included in the trial court's 60/40 division of marital property.

The listed cash value of the insurance policies awarded to Carol is $27,729, while the listed cash value of policies awarded to Richard is $4,583. The judgment for dissolution provides that each party shall maintain in full force and effect those life insurance policies awarded them and shall name the children of the parties as equal irrevocable beneficiaries of the policies until such time as the children reach the age of majority or complete their college education, whichever is last to occur, and until such time neither party shall borrow against said policies so as to reduce the death benefits thereunder and shall pay any interest on any outstanding loans against the policies so as not to reduce the death benefits thereunder. Upon completion of the college education of all the parties' children, or upon their reaching majority, whichever is last to occur, Carol and Richard shall each be the owner of the policies allocated to her or him respectively, free and clear of any claims of the other or the children, and of the restrictions stated in the judgment of dissolution.

Richard maintains he is entitled to an additional $8,341.80 to equal 40% ($27,729 + $4,583 = $32,312 x 40% = $12,924.80. $12,924.80 - $4,583 = $8,341.80). Carol points out that the judgment for dissolution requires that the beneficiaries continue to be the parties' children, and prohibits Carol from utilizing the cash values of the policies until the youngest child reaches majority or completes college, whichever occurs last. Matthew, the parties' youngest child, will not reach majority until the year 2002. Carol argues that if Richard dies before then, she will never realize any value from the policies since the proceeds would go to the children.

Richard argued to the trial court that the cash surrender value of the insurance policies should be considered an asset included in Carol's 60% share. The court ruled that "the policies' standards are going to be kept" at which time the following colloquy then took place:

> "THE COURT: There is one fallacy. Should he [Richard] die and there be no surrender, you have one value to the policy. Should the cash surrender value be taken the amount of the policy is reduced.
>
> [Richard's attorney]: Right.
>
> [Carol's attorney]: That's correct.

THE COURT: And what we ruled on in the case is those policies be kept.

[Richard's attorney]: I understand, but he is trying to say the valuation fee he didn't include is in his asset sheet. The policies were not included under her assets. The $19,000, that asset she owns.

THE COURT: As far as I am concerned, she doesn't have the right to borrow the money and therefore, she can't have it both ways. She can't have the money and the policy both, so therefore, as far as I understand it, she is obligated to keep the policies up, which means she can't borrow on them.

[Richard's attorney]: Okay, but when the children reach majority, if nothing happens, we will give him $19,000?

[Carol's attorney]: Twelve years down the road.

[Richard's attorney]: I never heard of such a thing.

\* \* \*

THE COURT: I have ruled."

■ The record reflects that the trial judge ordered the life insurance policies to be maintained for the benefit of the children until Matthew (seven years old at the time of the judgment) reaches majority or completes college, whichever event occurs last. The trial court ordered that Carol maintain the policies until said date and noted that Carol's financial interest in the policies is contingent upon Richard living past the time that Matthew reaches majority or completes college. The distribution of marital assets is within the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a clear abuse of discretion. (*In re Marriage of Bush* (1991), 209 Ill. App. 3d 671, 677, 567 N.E.2d 1078.) We believe the record reflects that the trial court considered the consequences, the benefits as well as the detriments, of awarding the life insurance policies to Carol and we cannot find that the trial court abused its discretion in doing so.

### ACERBEE PENSION FUND—LIMOUSINE FINANCIAL NOTE—OTC

The trial court awarded Richard the Acerbee pension fund at a value of $223,819. Richard maintains that according to the November 30, 1990, statement from Charles Schwab the value of the account was $210,547.49. The trial court awarded Richard the Limousine Financial note at a value of $190,913. Richard argues that on December 6, 1990, the note had a value of $176,232 because of a payment of principal earlier in 1990. Richard was awarded one of two OTC accounts at a value of $6,117. Richard maintains that the value in December of 1990 was $4,864.

Carol argues that petitioner's exhibit No. 90 supports the trial court's valuation of the OTC and the Limousine Financial note with current information as of the close of the proofs on December 6, 1990. On December 5, 1990, Richard testified the assets on exhibit 90 were generally correct with the exception of the Harris Bank checking account. He stated:

> "The remainder of these accounts to the best of my knowledge without having checked the pricing, you know, or the valuation, I believe to be correct ***."

Richard also testified that "the Limousine Financial Group was correct as to the note but the accrued interest is incorrect and we have had substantial amounts paid this year in the earning and the interest is correct." However, petitioner's exhibit 90 indicates a valuation date of "12/31/89" for the OTC and a valuation date of "9/30/90" for Limousine Financial.

Richard filed a motion to reconsider on July 18, 1991, in which he argued the trial court erred in valuing the Limousine Financial note, the Acerbee pension fund and the OTC account in that the values should have been determined as of the last trial date in December 1990. On August 16, 1991, Richard filed an "Emergency Motion For Re-Hearing," in which he again argued that the values of the Limousine Financial note, the Acerbee pension fund and the OTC account were incorrect in that the trial court should have valued those assets as of the last trial date in December 1990. Included in the exhibits attached to the motion for rehearing were a statement for Acerbee for the period November 1 through 30, 1990, and a statement for the OTC account dated December 30, 1990.

Carol argues that none of the lower values which Richard asserts are part of the trial record or properly before this court and that Richard relies on the exhibits appended to the emergency motion for rehearing which followed the denial of his post-trial motion to reconsider. Carol cites to *In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 90, 458 N.E.2d 1360, which states:

> " 'We again emphasize that it is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. [Citations.] Remanding cases such as the one before us would only protract the litigation

\*\*\*.' " (Quoting *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54-55, 448 N.E.2d 545, 550.)

Carol argues that Richard now improperly asks this court to remedy his failures in the trial court. (See *In re Marriage of Callaway* (1986), 150 Ill. App. 3d 712, 502 N.E.2d 366.) We believe in the present case that once Richard was aware that the trial court intended to use the last date of trial as the valuation date for the assets, he attempted to present the court with the proper values.

The last trial date in this case occurred on December 6, 1990. At the conclusion of the hearing on December 6, 1990, a schedule was set for briefing and closing argument. On May 17, 1991, the trial court stated that he would take the value of the assets as of the last trial date.

On May 17, 1991, there was some discussion regarding the value of the Acerbee pension fund; Richard asserted the value was $210,000, Carol asserted the value was $223,000 and the trial court discussed the possibility of splitting the difference.

On June 14 the trial court stated:

"With Schwab the indication was that we had the figures and there was a determination on Schwab. I am more troubled to be honest with you with the Limousine than on the two figures which were here on Schwab [Acerbee pension fund].

I believe it was 232 and 210. It is my recollection that I came to a figure half-way between which is roughly 21."

Subsequently the judge indicated that he did not have a recollection of the Limousine note with the exception that he recalled that it was placed on Richard's side, but he did not have a recollection of a valuation being accepted. The trial judge's recollection was that everybody talked about a valuation of $190,000. Carol's attorney then indicated the value was $190,000, while Richard's attorney indicated that the value was stated in his records as $176,000. After several pages of discussion regarding this asset, the trial judge indicated that the parties should obtain a transcript, and held that his recollection was that "we put 190 and put it on his side and ended there." Richard then testified that with regard to the Limousine note, he had been paid $26,000 in December. The trial court concluded the issue by stating that if the issue had not been decided it would allow the motion to reopen the proofs and go on from there. After a review of the record, we cannot find where the trial court initially found the asset to be valued at $190,000. On June 14 the trial court further stated that Schwab (Acerbee pension fund) had a value of $217,000.

■ The evidence presented in this case was substantial. From a review of the record it appears that the trial court stated that it intended for the parties to split the difference in valuations of the Acerbee pension fund and for the value to be $217,000. However, the value appears as $223,000 in the judgment for dissolution. We remand this matter to the trial court with directions to clarify its ruling as to the value of this asset.

We also remand the matter for a hearing as to the value of the Limousine Financial note as of the last date of trial. We believe the record is unclear as to what value the trial court initially placed on this asset. Further, even if the trial court did initially value the asset as $190,000, we find that the trial court abused its discretion in refusing to allow Richard to update the value as of the last trial date. Further, Richard has argued that between the last date of trial and the date the judgment for dissolution was final, he received a capital repayment on the note (approximately $26,000) and that he deposited said sum in another account that he was ultimately awarded. Richard argued that he was thus awarded the same sum twice. We believe under such circumstances the trial court should have allowed testimony on that issue.

On May 17, 1991, Richard's counsel did not object to a value of $6,117 on the OTC account. Richard has waived any objection to this value and, furthermore, in the present case we find any error in the value of this asset to be *de minimus*.

Accordingly, we remand the matter for clarification of the value of the Acerbee pension fund and for a hearing on the value of the Limousine Financial note on December 6, 1990. If Richard received money from Limousine Financial between December 6, 1990, and July 9, 1991, and said amount was deposited into an account such that said amount was accounted for twice, the trial judge should reduce the value of the asset accordingly. If the trial court determines that new values should be placed on either of the aforementioned assets, we direct the trial court to order Carol to pay Richard an amount that would rectify any discrepancy in the 60/40 division of property as a result of said errors in valuation.

### III

Richard alleges that in making its distribution of property the trial court abused its discretion and acted against the uncontroverted evidence by failing to take into account liabilities owed by Richard and, as a consequence, he actually received less than 40% of the marital property.

Richard maintains the record indicates he owed Thomas Pollard $20,000 as a real estate commission for a piece of property purchased for a business venture. Mr. Pollard testified that his firm was the "broker of record" for the sale of two parcels of real estate. However, he subsequently stated: "it was fuzzy as to our [Pollard's firm's] qualifications really as a broker." Pollard further testified that his firm was originally seeking $40,000 as commission, but they concluded at $20,000, which was not paid. No demand was ever made of Richard for payment of that broker's fee. Carol's attorney asked Mr. Pollard "[d]o you see any reason today as you sit here why he [Richard] couldn't pay the $20,000.00," to which Mr. Pollard replied, "[n]o."

In regard to the alleged debt to Mr. Pollard, the trial court stated:

"This Court has a severe doubt as to whether or not the money owed to Pollard was ever used.

I have too much doubt whether the money due to Pollard are real debts. ***

I am saying the Court does not consider Pollard a marital debt."

█ The credibility of the witnesses is for the trier of fact, who is in the best position to observe witnesses and their demeanor and assess the relative credibility of conflicting testimony on fact issues. (*In re Marriage of Malec* (1990), 205 Ill. App. 3d 273, 562 N.E.2d 1010.) Although Mr. Pollard testified that Richard owed him $20,000, he further testified that no demand had ever been made for the money. No other evidence was presented regarding the alleged debt. We find that the trial judge's finding was supported by the record and find no abuse of discretion on the part of the trial judge.

Richard further argues that Carol's attorney brought out the fact that he owed between $21,000 and $29,000 to Mr. Niekamp on a judgment entered against him in a limited partnership venture. Richard's testimony regarding this alleged debt came out during a hearing on support on June 13, 1991. Carol's attorney questioned Richard regarding his assertion that he paid $250 a month for accounting and attorney fees. The following is Richard's testimony regarding this alleged debt:

"A. Well, I got a bill today for $3,000 from Robert Udder, okay?

Q. For what?

A. Because there's been a judgment against me in the amount of 21 thousand or 27 thousand dollars.

Q. For what?

A. For an interest that I had in what was called a limited partnership.

Q. What limited partnership?

A. I don't remember the name of it.

Q. You don't remember the name of the limited partnership?

A. You have been provided with a copy of the judgment against us.

Q. Tell me the name of the partnership?

A. I don't remember.

Q. When did you get the judgment?"

The preceding testimony is found on the only pages Richard cites in the record with regards to this alleged debt. We find no indication in the record that Richard presented any testimony regarding this alleged debt or that a copy of the purported judgment was ever entered into evidence.

The trial court found with regard to this alleged debt:

"With regard to the liabilities Niekamp was never brought into evidence, Therefore, it doesn't exist."

In addition, the trial judge had previously stated he did not find Richard to be a credible witness. We find the trial judge's finding that no evidence of this alleged debt was presented to be supported by the record. Accordingly, the trial court acted properly in failing to consider this alleged debt.

## IV

In his fourth assignment of error, Richard argues that the trial court erred in refusing to permit evidence of valuation contemporaneous with the entry of the judgment for dissolution of marriage. The trial court employed the last day of trial, December 6, 1990, as the date of purported valuation. The judgment for dissolution of marriage was entered July 9, 1991.

Richard cites *In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 486 N.E.2d 267, and *In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 446 N.E.2d 1198, for the proposition that the proper date for the valuation of property is the date the judgment for dissolution of marriage is entered. However, in both *Brooks* and *Rossi*, the trial court entered a bifurcated judgment; a judgment for dissolution was entered while the question of property division was reserved for a subsequent date. The time lapse between the dissolution date and the time the trial court pronounced its findings as to property division was over five years in *Brooks* and approximately 2½ years in *Rossi*.

■ In the present case the judgment for dissolution of marriage encompassed all the issues of the property division. The present case was complex. Evidence was presented on numerous hearing dates as to the substantial assets acquired during the parties' 30-year marriage. In addition, evidence was presented as to the value of Carol's nonmarital estate, including the values of the trusts to which she is a lifetime income beneficiary. In order to dispose of the property issues at the same time the judgment for dissolution was granted, the trial court had to set the valuation date prior to entering the final judgment. We find that the trial judge did not abuse his discretion in setting the valuation date as the last date of trial.

Due to the complexity of this case, we find that the valuation date was not so remote from the date of judgment in time or in significant events. See *In re Marriage of Davis* (1991), 215 Ill. App. 3d 763, 767, 576 N.E.2d 44 (valuation three months prior to final judgment); *In re Marriage of Courtright* (1987), 155 Ill. App. 3d 55, 507 N.E.2d 891 (trial court did not abuse its discretion in utilizing valuations 4½ months and 11 months prior to dissolution as it is the obligation of the parties to present the court with sufficient evidence of the value of the property).

Notwithstanding our finding that the trial court acted properly in setting the valuation date as of the last date of trial, we believe Richard has waived this issue. Carol argues that Richard agreed to the valuation date. Richards argues that he did not and maintains that he attempted to point out the fact that many, if not all, of the marital assets were subject to changes in value caused by the passage of time by filing an emergency motion for rehearing with exhibits itemizing and detailing several errors in valuation.

Prior to the division of property, the trial judge indicated he was going to use the last date of trial as the valuation date. Richard's counsel did not object. Richard filed a motion to reconsider on July 18, 1991, in which he argued the trial court erred in valuing the Limousine Financial note, the Acerbee pension fund and the OTC account in that the values should have been determined as of the last trial date in December 1990. On August 16, 1991, Richard filed an "Emergency Motion For Re-Hearing," in which he again argued that the values of the Limousine Financial note, the Acerbee pension fund and the OTC account were incorrect in that the trial court should have valued those assets as of the last trial date in December 1990. Included in the exhibits attached to the motion for rehearing were a statement for Acerbee for the period November 1 through 30, 1990, and a statement for the OTC account dated December 30, 1990. In

neither motion did Richard object to the December 1990 valuation date. Questions not raised in the trial court are deemed waived and may not be raised for the first time on review. (*In re Marriage of Schuster* (1992), 224 Ill. App. 3d 958, 980, 586 N.E.2d 1345.) By Richard's trial and post-trial conduct, we find he has waived his right to challenge the valuation date.

V

In his fifth assignment of error, Richard argues that the trial court's support order requiring him to pay $2,250 per month should be reversed because it does not conform to the requirements of section 505 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 505) and, in addition, any order of support would be burdensome because of his lack of income from employment and the economic uncertainty of his endeavors in the consulting field.

On June 13, 1991, Carol testified as to her income and expenses as well as the expenses of the children. Richard submitted an affidavit of expenses and income which indicated an estimated monthly income of $6,685. However, he testified that the sum was incorrect as the sum represented an estimate and a forecast of what he thought he could do and at the time he had made no consulting income. As of that date Richard had no earned income for 1991, but he had collected some money from investments. During 1990 he had earned or received approximately $600,000 in income, including $80,000 in severance pay from Ameritech. Richard testified to his monthly expenses and indicated that his expenditures were exceeding his monthly income.

On October 11, 1991, a hearing was held on the issue of child support. Richard testified that in July 1991 he purchased a home for $325,000, with $162,500 down and a $162,500 loan from his mother and his sister. He repays his sister and mother each $500 per month. As of the hearing date, Richard was still unemployed and his monthly expenditures still exceeded his assets. Richard had been able to meet his expenses by liquidating the present balance of assets. He testified he earned $24,700 from consulting and he receives $1,560 interest income from all sources per month. Richard testified that his income for the year 1991 was $64,000. As of the date of the hearing, Richard had not yet filed his 1990 income tax return.

Carol testified as to her income and expenses. She testified that she currently had no income from her businesses. Carol testified that

she pays for medical insurance for herself and the children. Carol's expenses also exceeded her monthly income.

At the support hearing, the trial court considered an objection as to relevance, and stated:

"We are here under Section 505 of the Illinois Marriage and Dissolution of Marriage Act, aren't we? ***

I am looking at 505 and looking at the two sections, one for directing one towards guidelines and then the other is directed towards criteria how the guidelines are applied in each case.

Until the Court, after considering the evidence presents all the relevant factors, finds a reason for deviating from the guidelines by the relevant factors, which may include and is not limited to: (a) the financial resources of the children; (b) the financial resources and needs of the custodial parent; (c) the standard of living the child enjoyed while the parents were married and not divorced; (d) physical emotional condition of the child and education needs and his financial resources and the custodial parents.

Now I try to apply each one of the things. That is, what becomes frustrating about legislation. This list is inclusive and it is so hard for me to imagine anything that is to be put in there that is not relevant to this hearing. *** It will be under the statute for the needs of the children."

In ruling on the amount of support, the trial court reiterated its position that the $80,000 in severance pay was to be income. The trial judge indicated that he considered that money income because to him "severance pay is when somebody pays you when you are on a contract assuming there may be a lapse between that job and the new job." The trial court then held:

"Taking into account the husband's income, including the $80,000 *** for the year, plus the other income and I have come out with a figure of $2,250 *** per month will continue on until further order of the Court."

The following colloquy then took place between Richard's attorney and the court:

"[Richard's attorney]: Are you basing that on the net from the $80,000 *** plus what he has on the affidavit?

THE COURT: That's correct. That's correct.

MR. RINELLA: But what he has on the affidavit, Judge —.

THE COURT: And I am also basing it on the right of the wife's attorney to verify the 1990 income tax return which they are to have by October 15th. If you inconsistently based on the

tax statement, Mr. Rinella, if those statements are verified, fine."

Richard argues that the trial court never indicated what "other income" of his it was considering, or what the amount of that income might be. Richard argues that "the only income [he] had at the time of the hearing on child support with the exception of a little income from consulting work was income from dividends and interest earned on assets which were awarded to him by the Judgment for Dissolution of Marriage." However, the aforementioned colloquy between Richard's counsel and the court clearly indicates that the "other income" is the $64,000 reported by Richard as income on his affidavit.

Richard points to the second district case of *In re Marriage of Harmon* (1991), 210 Ill. App. 3d 92, 95-96, 568 N.E.2d 948, 951, arguing that the it was error for the trial court to employ income received by the husband from his share of the marital assets to determine his child support obligation. We find that Richard's reliance on this case is misplaced. In *Harmon* the respondent received interest payments on a principal balance of $90,000 from petitioner, in the amount of $750 per month. The court held that the monthly interest payments which comprised respondent's share of the marital assets should not have been used to calculate her net income. (*Harmon*, 210 Ill. App. 3d at 96.) In the present case, Richard is referring to passive income generated by his portion of the martial estate, rather than interest payments on a principal balance which represents his share of the marital property. We find that *Harmon* supports the trial court's decision to consider Richard's income from all sources. The court held:

> "A trial court's findings regarding net income are within the trial court's discretion. [Citation.] According to the Act, net income is the total of all income from all sources. (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(3).) We agree with the trial court's statement that passive income from bonds or securities will be considered when determining net income. [Citation.] However, when the unrefuted testimony is that the party does not actually receive the income from such passive sources, regardless of whether it is reported for Federal income tax purposes, it is not error for the trial court to refuse to consider the additional reported amounts when calculating net income." *Harmon*, 210 Ill. App. 3d at 95-96.

■ Richard argues the trial court should not have considered the $80,000 in severance pay from Ameritech as part of his income for purposes of determining child support in 1991 because the income was received in 1990. Although the income was received in 1990, the trial

court excluded the $80,000 from the property distribution on July 9, 1991. We find the trial court's decision to consider the severance pay as earnings in the present case was not an abuse of discretion.

The guidelines set forth in section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act provide for support in the amount of 32% of a parent's net income for three children. If the trial judge is following the guidelines outlined in section 505(a)(1), the statutory factors enumerated in section 505(a)(2) need not be considered. (See *In re Marriage of Tatham* (1988), 173 Ill. App. 3d 1072, 1093, 527 N.E.2d 1351.) However, since the guidelines were not used, the trial judge was required to consider the statutory factors set forth in section 505(a)(2). The trial judge here noted that he had considered the relevant factors in setting forth the structure of the child support.

The financial responsibility for the support of children is a joint and several obligation of each parent. (*In re Marriage of Butler* (1982), 106 Ill. App. 3d 831, 436 N.E.2d 561.) The determination of the proper amount of child support rests within the sound discretion of the trial court and will not be set aside unless found to be contrary to the manifest weight of the evidence, thus showing an abuse of discretion. (*In re Marriage of Reyna* (1979), 78 Ill. App. 3d 1010, 398 N.E.2d 641.) A court may consider past earnings in situations where current income is uncertain. (*In re Marriage of Butler* (1982), 106 Ill. App. 3d 381, 436 N.E.2d 561.) The record reflects that the trial court considered appropriate factors in determining Richard's support obligation. We find that the trial court did not abuse its discretion in setting the amount of child support.

Obviously, Richard will not receive another lump sum severance payment from Ameritech, and if he has not retained other employment or earned sufficient income from other sources, nothing prohibits him from seeking modification of his support obligation.

## VI

Diane (high school senior), Sharon (high school freshman), and Matthew (first grade) were enrolled at Elgin Academy (Elgin) for the 1991-92 school year. Carol testified that the tuition at Elgin Academy is approximately $8,000 a year for Sharon and $6,000 for Matthew, plus additional costs for a total of a little over $20,000. The trial court assessed $7,000 of the cost against Richard. In his sixth assignment of error, Richard asserts that the trial court abused its discretion and acted against the manifest weight of the evidence by ordering that he pay a portion of the minor parties' educational expenses at Elgin. Richard argues that he should not have to contribute to the cost of

the children's education at Elgin Academy because he is unemployed and there is suitable, less expensive alternative education available to them.

Richard testified that he did not want Matthew and Sharon to attend Elgin. He was willing to pay for a Catholic grade school or secondary education, but he was not willing to pay for Elgin. However, since at the time Diane was a junior or senior at Elgin, Richard felt she should complete her high school education there without interruption. Richard testified that he found Elgin, went out, researched it, and took the kids (namely Jim) over there and let them look at it. He believed Elgin had been the right choice for Jim, but not for the other kids.

Richard testified that all of the parties' children had eight years of Catholic education, all having attended Catholic grammar schools. Richard denied that he never objected to the children attending Elgin until after the parties filed for divorce.

Carol testified that currently she had three children, Diane, Sharon, and Matthew, enrolled at Elgin. Two of the older children had attended Elgin in the past; Sheila attended Elgin for four years; and Jim had attended Elgin for one year. Carol testified that she consulted or discussed the transfer of the children to Elgin with Richard, who participated in the selection process. The first occasion a transfer to Elgin was discussed was in August of the year that Jim was to be a senior. Carol, at that time, testified the parties had originally signed Sheila up to attend a Catholic high school; however, the parties agreed Sheila would be allowed to attend Elgin instead. Carol testified that Richard did not express his concern that the children would not be going to a Catholic school until she filed for divorce. She acknowledged she had heard "many good things" about Elgin, and she was "very pleased" with the education the children were receiving there. Carol testified that from the time the children were enrolled in Elgin until December of 1987, the tuitions for Elgin were paid for by Richard. When questioned if she had explored the possibility of sending the first-grade son to a school in Barrington instead of Elgin Academy, Carol responded that her other children were at St. Anne's, but she was extremely displeased with it and would not want to send him there. When asked if the children that went to St. Anne's got a good education and are faring well, Carol responded, "They are doing much better since they have gone to Elgin. I did not feel they had a good education at St. Anne's and they didn't either."

The trial court articulated the factors underlying the decision:

"The law says to me, I don't take into account when working class people divorce even the parochial limited amount. I don't have to take that into account unless it was the standard of living. The more difficult part is high school. That is much more difficult than college to rule. But for example, had these children had a history of going to Barrington High School and they want something different, they would pay for it. The problem I have against the background is I take the standard of living of the children prior to the divorce. That is my criteria [*sic*]."

In determining that the children would remain at Elgin Academy, the court stated:

"I made the point in the determination of the lifestyle of these people was to have the children at Elgin. I made that my finding of fact. Now, that's my finding of fact."

In *In re Marriage of Alexander* (1992), 231 Ill. App. 3d 950, 955, 596 N.E.2d 1335, the reviewing court affirmed the continuation of a parochial school education (since the fourth grade) for a child entering high school:

"We find that having basically acquiesced in Michael's attendance at parochial grade school for a number of years, that respondent's objection to his attendance at a parochial high school on the ground it is an inappropriate choice of schools is of no particular significance. * * *

* * * We do not find it inappropriate * * * to have relied on the advice of others who had knowledge. * * * Drawing upon the experience of others is often the best way for a parent to learn the merits of a particular school."

The history of the education of the parties' children discloses that (1) Richard agreed to his son Jim attending Elgin for his senior year, (2) he agreed to Sheila attending four years of high school at Elgin, and (3) he had acquiesced to Diane attending Elgin for high school. Thus, prior to the parties' divorce, three of the parties' children had attended or currently attend Elgin for high school. However, the testimony of the parties indicates that eight of the parties' children (all except Matthew) attended Catholic grammar schools.

■ We believe it is consistent with the parties' lifestyle prior to the divorce to allow the minor children to attend Elgin Academy for high school. However, we believe it is inconsistent with the parties' lifestyle prior to the divorce to have Matthew attend grammar school at Elgin. In addition, it is evident that Richard did not consent to, nor acquiesce to, Matthew attending grammar school at Elgin. We find that the trial court abused its discretion in ordering Richard to con-

tribute to Matthew's educational expenses based on the tuition at Elgin Academy, but we reject Richard's argument that he should not contribute at all to the educational expenses of the minor children. Although Richard was unemployed at the time of the hearing, he received income from consulting as well as from dividends and interest. The trial court considered appropriate factors in making the threshold determination that Richard could contribute something to the children's educational expenses.

Accordingly, for the reasons set forth above, we reverse the decision of the trial court ordering Richard to contribute $7,000 for the expenses of Matthew and Sharon at Elgin, and remand the matter to the trial court for a hearing to recalculate the appropriate amount of Richard's contribution. Due to the fact that the parties have a history of sending their children to private grammar schools, albeit not as expensive as Elgin, the trial court should, in addition to considering an appropriate contribution to Sharon's expenses at Elgin, consider an appropriate contribution towards Matthew's educational expenses based on an education at a Catholic grammar school (a school comparable to that which the parties' other children have attended).

Affirmed in part; reversed and remanded in part with directions.

McNULTY and COUSINS, JJ., concur.