2023 IL App (1st) 220949-U

SIXTH DIVISION

December 22, 2023

No. 1-22-0949

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| SONYA Y. REED, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 20 D 3344 |
| | ) | |
| VERNON D. REED, | ) | Honorable |
| | ) | Naomi H. Schuster, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justice Hyman concurred in the judgment.
Justice Tailor concurred in part and dissented in part.

**ORDER**

¶ 1    *Held:*    In this divorce matter, we reverse the circuit court on portions of its dissipation and marital distribution rulings, and remand for the limited purpose of redistribution of the specified assets.

¶ 2     After a bench trial, the circuit court entered a judgment for dissolution of marriage between petitioner Sonya Reed and respondent Vernon Reed and distributed the marital assets. Sonya appeals, arguing the court erred in its distribution by (1) declaring certain property nonmarital, (2) rejecting her claim of dissipation, and (3) improperly distributing the assets favorably to Vernon. For the reasons below, we reverse the court's order in two narrow respects, and remand for the limited purpose of redistribution according to this order.

¶ 3                                      I. BACKGROUND

¶ 4     Sonya and Vernon married on April 9, 2011. On May 26, 2020, Sonya filed a petition for dissolution of marriage, citing irreconcilable differences. In her petition, she requested that the circuit court award the parties their respective nonmarital property, distribute the marital debt equally, and order Vernon to pay maintenance and attorney's fees.

¶ 5     On July 28, 2020, Sonya filed a petition for temporary maintenance, in which she claimed Vernon earned approximately $10,890.39 per month while she earned approximately $2,610 per month, which was insufficient to pay her monthly expenses.

¶ 6     On August 20, 2020, Vernon filed his response to Sonya's petition for dissolution, in which he requested that the circuit court make a fair and equitable distribution of the parties' marital assets and marital debts and hold both parties responsible for their own attorney's fees. He also asked the court to deny Sonya's request for temporary maintenance because she is "an able-bodied individual that can work and make a good salary as an attorney." Vernon further requested that the court deny Sonya's request for exclusive possession of the couple's home, hereinafter referred to as "the Matteson property," to order her to move out, and to give him exclusive possession because Sonya had signed over her interest in it to him.

¶ 7       Sonya argued in response that although she had previously been employed full-time as a staff attorney for Jenner & Block from October 2010 until July 2018, she could only secure part-time employment through a temporary placement agency after she was laid off. The agency assigned her to multiple short-term projects, including during the Covid-19 pandemic, where she earned $22 to $28 per hour. As a result, she had insufficient funds to pay her monthly expenses. She admitted that in May 2020, she sold a property in Chicago she had purchased before the marriage and received approximately $10,000 from the transaction.

¶ 8       The circuit court granted Sonya exclusive possession of the Matteson property until February 1, 2021. The court ordered Sonya to "pay maintenance, utilities, and upkeep" on the Matteson property from November 1, 2020, until February 1, 2021, and ordered Vernon to pay the mortgage and insurance in lieu of maintenance.

¶ 9       On April 9, 2021, Sonya filed an Amended Notice of Intent to Claim Dissipation. In it, she alleged that an "irreconcilable breakdown" in her marriage to Vernon began on October 9, 2013, due to Vernon's infidelity and physical, emotional, and mental abuse. She alleged that Vernon dissipated assets by making payments from his BMO Harris Checking Account between 2015 and 2020, totaling approximately $168,574.67. She also alleged that he made numerous cash withdrawals from his BMO Harris Checking Account between 2015 and 2020, totaling $182,429.63. Sonya said she did not learn of these transactions until she received a copy of the bank statements in discovery.

¶ 10      The circuit court held a trial on the Petition for Dissolution of Marriage on July 14, 2021, September 27, 2021, and November 23 and 24, 2021.

¶ 11      One disputed asset discussed at trial was a property in Chicago Heights where Vernon stayed during the separation. Vernon testified that he "inherited" the property sometime between

November 2019 and January 2020 after his father, Fred Reed, passed away. He stated that the property had been transferred to him under the terms of a trust his father created. Vernon had limited documentary evidence to support this assertion—specifically, a deed, dated April 12, 2017, whereby Fred Reed conveyed the Chicago Heights property to "Fred Reed, as Trustee of the Fred Reed 2017 trust." To counter, Sonya argued in a motion *in limine* that Vernon could have purchased the property from his father instead of inheriting it. The record does not show that she offered any evidence regarding the Chicago Heights property at trial.

¶ 12    Concerning dissipation, Sonya contended the breakdown of the marriage began in October 2013 due to Vernon's infidelity and abuse, and that Vernon had dissipated their assets by making payments and cash withdrawals totaling more than $350,000 between 2015 and 2020. Vernon testified that throughout the course of the marriage, he used cash to make various purchases, including multiple vehicles, and he frequently provided cash to Sonya and others. He also testified that he gambled and spent money in Las Vegas, and Sonya knew of his gambling habits. The parties agreed Vernon moved out of the marital home on January 15, 2020, after the two discussed separating while on a trip in December 2019. The record shows Vernon made withdrawals and transfers of $72,892.03 in 2020 and January 2021.

¶ 13    On the Matteson property, Vernon testified that he purchased the home for $225,000 in January 2012, which was shortly after he and Sonya married. He paid the down payment by selling a vehicle, boats, and a motorcycle that he owned before the marriage, but he submitted no documentation to show that the funds used for the down payment were nonmarital funds. He further claimed that because he had been married and divorced three times before and was concerned about losing property in a future divorce, he and Sonya agreed before the purchase that "she would not have an interest in [the Matteson property]." He did not have this agreement in

writing but believed that "the waiver of the homestead that Sonya signed is proof that she waived her rights to the property." Sonya denied the agreement, and testified that although she signed a homestead waiver, she had a "clear understanding" that she was not waiving her marital interest in the property. The circuit court also heard evidence that Sonya paid $1,200 a month for expenses at the Matteson property, and the home equity equalled approximately $170,000.

¶ 14    Regarding their respective checking accounts, the evidence showed Vernon had $168,403 in a BMO Harris account, while Sonya had $34,158 across two Citi Bank accounts. The total of Vernon and Sonya's checking accounts was $202,561.

¶ 15    On January 28, 2022, the circuit court issued its decision. As relevant here, the court categorized the Chicago Heights property as nonmarital property. The court explained that Vernon "presumes to have acquired an interest in [the Chicago Heights] property" and that he "believes" that the property "is his under the terms of an inheritance plan that his father, who is now deceased, had devised." Although the court acknowledged Vernon provided "minimal" documentation, it believed it was "clear" that if Vernon had "an interest in that property," it came via inheritance.

¶ 16    On Sonya's dissipation claim, the circuit court noted again that Vernon supplied "limited documentation," but noted that:

> "[D]uring the trial and in closing arguments it was acknowledged by [Sonya] that there were actual cash purchases that were made by [Vernon] during the course of the marriage. And [Vernon] credibly testified that throughout the course of the marriage that he used cash to make various purchases and to provide cash both to [Sonya], for himself, and others, including the purchase of cars and campers and the like."

The court considered Vernon's testimony and "the course of conduct which appears to be undisputed between the parties as it related to casinos or street gambling," and also found that

"almost up until the time of separation, [Vernon and Sonya] continued to travel together and \*\*\* they functioned together as a married couple." The court found that "to go back to 2015 to maintain that cash withdrawal[s] [or other payments] support a claim of dissipation, the [c]ourt cannot find that dissipation occurred," and thus, "based upon the testimony and the assessment of the credibility of witnesses, [the dissipation claim] will be denied."

¶ 17    Regarding the Matteson property, the circuit court stated that it had "heard the testimony of both parties, observed their demeanor, assessed their credibility and also considered \*\*\* the submissions" of both parties. The court rejected Vernon's contention that the homestead waiver and the alleged source of the down payment rendered the property nonmarital, but ultimately awarded the property to Vernon free of any interest from Sonya "[a]s a result of the distributions of the marital assets and the marital estate." The court explained that (1) the deed and mortgage were solely in Vernon's name, (2) Vernon testified that the down payment for the home came solely from his nonmarital funds, and (3) it was "undisputed" that Vernon paid the mortgage and insurance payments, and that Sonya contributed approximately $1,200 per month. The court found Vernon credible regarding "the parties' intention" when Vernon acquired the Matteson property and Sonya's signing of a homestead waiver and found Sonya's "contributions to the property were minimal." The court permitted Sonya exclusive possession of the Matteson property until February 1, 2022, and ordered Vernon to pay the mortgage and insurance obligations during that time. The court clarified that it awarded Vernon the full $170,000 in equity in the Matteson property, and stated, "I considered that in my award of the contribution for attorney's fees."

¶ 18    Concerning the checking accounts, the circuit court noted the "parties have been separated for approximately two years and have not commingled finances since the time of separation," and

accordingly, "each party will be awarded their accounts and the balances that are maintained by each of the parties in their sole and individual name."

¶ 19    On maintenance, the circuit court found that guideline maintenance would be zero based upon Sonya's current income and concluded that "each party is able to provide for their own support without any contribution from the other." In so finding, the court noted that Sonya had been employed as an attorney in Georgia since June 2021, earning $88,500 annually, and that Vernon derived his income from a military pension, rental property, disability benefits, and his job as a high school reserve officer training corps instructor. The court further stated that it reviewed Sonya's petition "carefully," but found her testimony "troubling" due to credibility concerns, and lived on the Matteson property while Vernon paid the mortgage and insurance. Therefore, it concluded that there would be "no support for rehabilitative maintenance" for Sonya.

¶ 20    Finally, the circuit court ordered Vernon to pay $10,000 in attorney's fees, in part because "for a period of time in the marriage [Vernon] was an income earner that exceeded [Sonya's] income[1].

¶ 21    On February 28, 2022, Sonya filed a Petition to Vacate, Modify, or Reconsider the Court's Judgment for Dissolution of Marriage. She argued that the court had awarded a substantially disproportionate share of the marital estate to Vernon, and that it erred, in relevant part, in its findings on the Chicago Heights Property, dissipation, and the marital asset distribution generally. The court denied her motion.

¶ 22                                II. JURISDICTION

---

[1] We note that the marital assets distributed by the court consisted of much more than is discussed above, but the specifics of those assets, and the distribution thereof, are not relevant to Sonya's claims.

¶ 23    The circuit court denied Sonya's posttrial motion on May 26, 2022, and Sonya filed her notice of appeal on June 27, 2022. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 24                                III. ANALYSIS

¶ 25    On appeal, Sonya argues the circuit court erred by: (1) characterizing the Chicago Heights property as Vernon's nonmarital property; (2) denying her dissipation claim; and (3) distributing the marital property in Vernon's favor.

¶ 26                        A. The Chicago Heights Property

¶ 27    We begin with the circuit court's finding that the Chicago Heights property was Vernon's nonmarital property. This was a factual finding, which we will not disturb unless it is against the manifest weight of the evidence. *In re Marriage of Budorick*, 2020 IL App (1st) 190994, ¶ 55. A circuit court's decision on whether property is marital or nonmarital is "against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." (Internal quotation marks omitted.) *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 49 (quoting *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 3). "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). The party contending property is nonmarital must overcome, with clear and convincing evidence, the statutory presumption that property accrued by a spouse during a marriage is marital property. 750 ILCS 5/503(b)(1) (West 2018). Clear and convincing evidence in this context is evidence that creates "a high level of certainty and is considered to be more than a preponderance while not quite approaching proof beyond a reasonable doubt." *In re Marriage of Gordon*, 233 Ill. App. 3d 617,

8

647 (1992). One way a spouse can rebut the presumption and show a disputed asset is nonmarital is through establishing it was a gift. 750 ILCS 5/503(a)(1) (West 2018).

¶ 28    Vernon contends that the Chicago Heights property was a gift from his father. "There is another presumption that a transfer from a parent to a child is presumed to be a gift, and that presumption may be overcome by clear and convincing evidence to the contrary." *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). In instances like this, with the marital property presumption and parental gift presumption in competition, the presumptions cancel each other out. *Id.* at 186-87. The factfinder must then resolve the issue based on a manifest weight of the evidence standard, and is "free to determine the issue of whether the asset in question was marital or nonmarital property without resort to the presumption." *Id.* at 187. The party arguing that an asset is a nonmarital gift bears the burden in this situation. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 259 (2000). "A gift is a voluntary gratuitous transfer of property from donor to donee where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee." *In re Estate of Poliquin*, 247 Ill. App. 3d 112, 115 (1993)*.* "A valid gift requires proof of donative intent and delivery of subject matter." *In re Marriage of Schmidt*, 242 Ill. App. 3d 961, 968 (1993).

¶ 29    We note that Vernon's brief conflates "gift" and "inheritance." In this context, however, it is the *transfer* from parent to child that is important and gives rise to the presumption that the property (however the transfer was accomplished) should be analyzed as a parental "gift" specifically for purposes of determining whether the property fits into the "gift, legacy, or descent" statutory exception, so the distinction has no functional importance to this case. See *Hagshenas*, 234 Ill. App. 3d at 186; 750 ILCS 5/503(a)(1) (West 2018).

¶ 30    The record contains limited evidence regarding the nature of the alleged Chicago Heights property transfer. Fred, of course, could not testify. Vernon testified that he inherited the property from Fred following his passing (sometime from November 2019 to January 2020) and offered documentation from 2017 showing that the Chicago Heights property was in Fred's trust at that time, with Fred as trustee, though Vernon did not offer proof of any subsequent transactions. The record also showed Vernon lived at the Chicago Heights property during the separation. Sonya argued in a motion *in limine* that Vernon could have purchased the property from Fred's estate, but offered no evidence at trial about the property. The circuit court found that though the record was unclear that Vernon actually owned the Chicago Heights property, to the extent that he did own it, the property was nonmarital.

¶ 31    We find that the court's decision that the property was a nonmarital gift was not against the manifest weight of the evidence. The evidence Vernon offered, alongside the dearth of evidence from Sonya, sufficed for Vernon to meet his burden after the competing presumptions canceled each other out. *Hagshenas*, 234 Ill. App. 3d at 186-87. While Fred could not testify regarding his donative intent, the evidence did show the property was in Fred's trust (of which Fred was the trustee) in 2017, Vernon lived there during the separation, and Vernon testified that Fred gifted him the property via inheritance. This constituted evidence on each element needed to establish the property transfer was a gift, *i.e.,* donative intent and finality of transfer, which then left it to the circuit court to weigh that evidence and draw reasonable inferences therefrom. See *Didier*, 318 Ill. App. 3d at 259; *Best*, 223 Ill. 2d at 350-51. The court did so in Vernon's favor, which was its province to do. See *In re Marriage of Patel and Sines-Patel*, 2013 IL App (1st) 112571, ¶ 78. Sonya offered no evidence regarding the Chicago Heights property for the court to weigh against Vernon's. Also, importantly, the court emphasized that it found Vernon a credible

witness (in the context of both the Matteson property and the dissipation claim), and stated it was "clear" that if Vernon in fact owned the property, it was nonmarital property, further suggesting it found Vernon credible on this issue.

¶ 32    We acknowledge the lack of documentary evidence. We take guidance, though, in a principal in the related area of tracing of whether the source of disputed funds was marital or nonmarital. In that context, this court has held that the clear and convincing evidence standard may be met through witness testimony alone. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 174 (2000). In this case, the circuit court repeatedly stated it found Vernon a credible witness, and on a manifest weight of the evidence review, the reviewing court should defer to the lower court on issues of witness credibility and the weight to assign testimony. *Best*, 223 Ill. 2d at 350-51. In the absence of any evidence from Sonya, we cannot say that the court here was not entitled to weigh Vernon's testimony strongly if it found it credible, and then find that the testimony, in combination with the fact that Vernon was living at a property which, at least in 2017, belonged to his father, who was now deceased, sufficed to demonstrate that Vernon acquired the Chicago Heights property as a gift from his father.

¶ 33    *Patel* is instructive on this issue. There, the circuit court found that money a party [Amy] received from her father was a gift, and rejected the argument that it was marital property (in the form of a marital debt). *Patel*, 2013 IL App (1st) 112571, ¶¶ 76-80. The only evidence on the issue was Amy's testimony, which the lower court found incredible. *Id.* ¶¶ 77-78. On appeal, the *Patel* court found that this decision was not against the manifest weight of the evidence because, "it was the function of the trial court here to accept or reject Amy's testimony that the money from [her father] was a loan. The trial court found that Amy was not a credible witness." *Id.* ¶ 78. Likewise,

11

here it was the circuit court's function to accept or reject Vernon's testimony that the Chicago Heights property was a gift from his father, and the court chose to accept the testimony.

¶ 34    *Didier* provides further guidance. There, this court found the circuit court's finding of a gift was against the manifest weight of the evidence because "One of the elements of a gift is that the transfer must be *gratuitous*," and "The record [was] quite clear that the [property at issue] was *not* a gift" where the proponent testified that she purchased the property from her father (Emphasis in original.) *Didier*, 318 Ill. App. 3d at 261. Contrast the situation here, where Vernon's testimony was that the Chicago Heights property was a gift, and nothing in the record countered that he received the property without paying for it.

¶ 35    The dissent advances multiple arguments as to why certain aspects of Vernon's evidence—his testimony, the deed, the fact Vernon lived at the property during the separation—do not individually satisfy certain elements of "a gift." In doing so, the dissent makes no attempt to address the collective effect of the evidence, and the reasonable inferences the circuit court drew therefrom. Additionally, the dissent does not distinguish our citation to *Patel* for the proposition that, in a *Hagshenas*/*Didier* scenario, "it is the function of the trial court" to weigh the evidence and determine a witness's credibility. *Patel*, 2013 IL App (1st) 112571, ¶ 78. This is telling. The dissent's position here boils down to its desire to substitute its judgment for that of the circuit court and weigh the evidence against Vernon, which is simply improper for a reviewing court to do. *Best*, 223 Ill. 2d at 350-51. While it was still Vernon's initial burden to introduce evidence on the nature of the property, he did so, and without anything to counter from Sonya, the court could reasonably find that the manifest weight of the evidence favored Vernon.

¶ 36    We further note the dissent's discussion that Vernon did not establish the initial transfer. This argument is of no consequence because the circuit court based its decision on the presumption

that a transfer of the property to Vernon had occurred; it was only that to the extent Vernon had been transferred the property that the court found it was via inheritance from Fred. If no transfer occurred, the Chicago Heights property issue is purely academic because the property would not be part of the marital estate.

¶ 37    In sum, the circuit court was presented with limited evidence on this issue, but only Vernon offered anything to help clarify the nature of the Chicago Heights property. Because neither the marital property presumption nor parental gift presumption applied, it was Vernon's reduced burden to present sufficient evidence such that the court could find the manifest weight of the evidence went in his favor. And his own testimony, which the court found credible, along with the fact of his residency at the property (which Fred's trust owned as recently as 2017), sufficed for the court to find Vernon carried this burden, particularly in the absence of any evidence in rebuttal from Sonya.

¶ 38                                    B. Dissipation

¶ 39    Next, Sonya argues that Vernon dissipated the marital assets by making payments and cash withdrawals totaling more than $350,000 between 2015 and 2020, and thus the circuit court erred by denying her dissipation claim. We review a circuit court's dissipation finding for an abuse of discretion and will reverse only if "no reasonable person could adopt the trial court's position." *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 831 (1994).

¶ 40    "The dissipation of marital assets occurs when one spouse uses marital property for a purpose that is unrelated to the marriage and is for his or her own benefit at a time when the marriage is undergoing an irreconcilable breakdown." *Henke,* 313 Ill. App. 3d at 177. "The issue of dissipation is generally a question of fact." *In re Marriage of Tietz,* 238 Ill. App. 3d 965, 984 (1992). The party charged with dissipation must "demonstrate through clear and specific evidence

how the suspect funds were spent." *Henke*, 313 Ill. App. 3d at 177. Before deciding whether dissipation occurred, a lower court must determine the point at which the irreconcilable breakdown began. See *In re Marriage of Sinha*, 2021 IL App (2d) 191129, ¶¶ 33-36.

¶ 41    Sonya testified that the marriage began undergoing an irreconcilable breakdown on October 9, 2013, due to Vernon's alleged infidelity and abuse, but offered no additional evidence to support this assertion. The circuit court never explicitly addressed the breakdown date, but its comments indicate that it did not believe it began in 2013. After hearing testimony that Sonya and Vernon regularly went on dates, cruises, and couples' trips each year up through December 2019, the court commented that "almost up until the time of separation, [Vernon and Sonya] continued to travel together and *** they functioned together as a married couple." The court ultimately concluded that "to go back to 2015 [the repose period for a dissipation claim is 5 years] to maintain that cash withdrawal[s] [or other payments] support a claim of dissipation, the Court cannot find that dissipation occurred."

¶ 42    When the evidence presented is insufficient to determine the irreconcilable breakdown's beginning, courts have used the date of separation or the date the petition for dissolution was filed. See, *e.g., In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 86 (without clear evidence of an irreconcilable breakdown date, the claimant could "only claim dissipation for the period after the parties separated"). In this case, the circuit court's comments indicated that it denied Sonya's dissipation claim in part because it found the evidence that she presented was insufficient to show the breakdown began in 2013, and implicitly found instead that the marriage did not begin to breakdown until the date of separation. The record also supports this conclusion. We therefore agree with the court's conclusion that Sonya failed to prove that the marriage began to break down before the parties' separation date of January 15, 2020.

¶ 43    We disagree, however, with the circuit court's conclusion that no dissipation occurred after the parties' separation date. Vernon had the burden to demonstrate through clear and specific evidence how the funds at issue were spent, but the record shows he offered no receipts or other evidence to account for the $72,892.03 in payments and cash withdrawals he made in 2020 and January 4, 2021. See *Hamilton*, 2019 IL App (5th) 170295, ¶ 78. Vernon testified generally that he withdrew large amounts of cash throughout the marriage, which he used for dinners and trips for him and Sonya, but provided no examples of the places he took Sonya or the amounts he spent. He also said that he routinely withdrew cash for personal use, gave Sonya $700-$800 a year in cash for a shopping spree, and gave his nieces and nephews cash "all the time," but could not provide a dollar amount or any additional specifics regarding these expenditures. Vernon also could not quantify the amount he spent gambling. These vague contentions simply do not constitute clear and specific evidence of how Vernon spent the over $70,000 in withdrawals and payments relating to the relevant period, and thus Vernon did not satisfy his evidentiary burden.

¶ 44    Vernon argues that his credible testimony that he "used cash to make various purchases and provide[d] cash for individuals throughout the marriage" was sufficient, relying on *In re Marriage of Berberet*, 2012 IL App (4th) 110749. There, the lower court concluded that no dissipation occurred, even though the accused spouse "could not recall the nature of specific expenditures and dates for those expenditures," and the *Berberet* court affirmed this decision. See *Berberet*, 2012 IL App (4th) 110749, ¶ 56. *Berberet* is distinguishable, however, because there the accused spouse "provided the court with the relevant financial records," and testified credibly regarding his "routine use of cash." *Id.* Here, by contrast, Vernon provided *no* financial records to indicate how he spent the funds at issue in 2020, and we find that his vague testimony, standing alone, was insufficient to demonstrate that the payments and cash withdrawals he made from his

checking account in 2020 were used for purposes related to the marriage. See *Hamilton*, 2019 IL App (5th) 170295, ¶ 78 (a party must demonstrate through clear and specific evidence how the suspect funds were spent); *In re Marriage of Carter,* 317 Ill. App. 3d 546, 552-53 (2000) (finding dissipation when the husband's explanation of "how he spent the rest of the money for 'household expenses' and 'repairs' was too general and vague to satisfy his burden"); *In re Marriage of Rai,* 189 Ill. App. 3d 559, 569-70 (1989) (finding the circuit court abused its discretion when it concluded that the husband did not dissipate assets when he "gave vague statements that the funds were spent on certain items" and "admitted that he was unsure of where the money went or how the funds were spent," because this "inconsistent, vague testimony was unsupported by any credible documentation").

¶ 45     Because we find that the circuit court abused its discretion when it found that Vernon did not dissipate marital property after the parties' separation date, the $72,892.03 relating to this period should be factored back into the marital estate when the court redistributes on remand. See 750 ILCS 5/503(d)(2) (West 2018) ("In a proceeding for dissolution of marriage *** the court shall *** divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including: the dissipation by each party of the marital property").

¶ 46                                C. Marital Property Distribution

¶ 47     Sonya also challenges the circuit court's marital property distribution, arguing that the court erred when it awarded Vernon 87% of its total value. She specifically alleges that the court erred by (1) incorrectly distributing the funds in the parties' checking accounts, and (2) improperly awarding the Matteson property to Vernon. Regarding the Matteson property, Sonya contends that the court improperly based its ruling on Vernon's allegation of Sonya's alleged homestead waiver and his account of the property's purchase, and further contends the court failed to consider the

relevant statutory factors for marital distribution aside from the parties' respective contributions to the property.

¶ 48    Because the distribution of marital assets is within the circuit court's discretion, we review its decision for an abuse of discretion. *Henke,* 313 Ill. App. 3d at 175. This discretion, however, "is not unlimited. A division of property must be reasonable and must meet the statute's objectives," which include "plac[ing] each party in a position to begin anew." *In re Marriage of Agazim*, 176 Ill. App. 3d 225, 231 (1988).

¶ 49    Per statute, circuit courts divide marital property decisions by balancing twelve factors. 750 ILCS 5/503(d) (West 2018). These factors include each party's contribution "to the acquisition, preservation, or increase or decrease in value of the marital *** property"; the "dissipation by each party of the marital property"; the value of each spouse's assigned property; the marriage's length; the "relevant economic circumstances of each spouse when the division of property is to become effective"; the "age, health, station, occupation, amount and sources of income, vocational skills, employability *** and needs of each of the parties"; and the "reasonable opportunity of each spouse for future acquisition of capital assets and income." *Id.* A circuit court must consider each factor but is not required to make express findings regarding each on the record. See *In re Marriage of Benkendorf*, 252 Ill. App. 3d 429, 433 (1993). "The touchstone of apportionment of marital property is whether the distribution is equitable in nature." *Tietz,* 238 Ill. App. 3d at 979. "Equal distribution of marital property is generally favored, unless application of the statutory factors demonstrates an equal division would be inequitable." *In re Marriage of Minear,* 287 Ill. App. 3d 1073, 1083 (1997). However, "[a]n equal division of marital assets is not required, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result." *Henke,* 313 Ill. App. 3d at 175.

¶ 50    We find that the circuit court abused its discretions specifically regarding the checking accounts, but not regarding the remainder of the distribution. On the checking accounts, the court awarded Vernon the funds in his account, totaling more than $160,000, and Sonya only the funds in her accounts, totaling approximately $34,000. The record shows the court based this decision on the fact that Vernon and Sonya "ha[d] been separated for approximately two years and ha[d] not commingled finances since the time of separation." This was error because the law is clear that regardless of the date of a couple's separation, the funds in a spouse's checking account remains marital property until the time of dissolution. See *Henke,* 313 Ill. App. 3d at 167 (stating that "funds deposited into the checking account following the parties' marriage are marital property, as renumeration in whatever form to a spouse during a marriage is considered marital property"); *In re Marriage of Tatham,* 173 Ill. App. 3d 1072, 1091 (1988) ("[i]t is the date of dissolution and not the date of the parties' separation that is determinative as to what property was acquired during a marriage"); *In re Marriage of Brooks,* 138 Ill. App. 3d 252, 259 (1985) (finding that the husband's suggestion that the date of the parties' separation should be used as the termination date of the wife's property rights was "baseless" and stating that "[l]aw and policy will not support such a result"). The court appears to have misapprehended this rule; though it did not declare the checking accounts officially as the nonmarital property, it distributed the amounts as such, and this constituted an abuse of discretion.

¶ 51    We reject, however, Sonya's broad contention that the marital distribution outside of the checking accounts was generally improper. Each of Sonya's arguments on this point center on the resolution of the Matteson property, and each fail. First, the record positively rebuts her arguments that the circuit court improperly considered the homestead dispute or Vernon's contention that the Matteson property should be considered his own nonmarital property. The court directly rejected

these arguments on the record, expressly finding the property was marital property, and explained it awarded it to Vernon "[b]ecause of the distribution of the marital assets and the marital estate."

¶ 52 Sonya next argues that the circuit court improperly focused solely on the parties' relative contributions to the Matteson property in making its distribution, pointing to its statement in the record that Sonya's contribution was "minimal." This argument fails both legally and factually.

¶ 53 First, the argument fails because the law is clear that while a distributing court must *consider* each relevant factor, it need not make express findings regarding each factor on the record. See *Benkendorf*, 252 Ill. App. 3d at 433. In other words, the fact that a circuit court only mentions a certain factor or factors on the record when distributing marital property is not grounds to conclude it ignored the other factors. Thus, the circuit court's focus on the parties' contributions to the Matteson property when considering how to distribute that property is not a proper ground to conclude it improperly considered only a single factor when distributing the marital assets.

¶ 54 Sonya's argument also fails factually because it misconstrues the record. Counter to Sonya's characterization, the record demonstrates that the circuit court considered myriad factors outside of the parties' contribution to the Matteson property in distributing the assets, and even in resolving the Matteson property distribution itself. Specifically, the court responded to a question regarding the distribution of the equity in the Matteson property by stating it balanced not awarding equity by awarding her attorney's fees. The record also shows the court weighed Sonya's ability to make her own living and procure assets in the future based on her status as an attorney, which indicates it considered numerous statutory factors beyond respective contributions in its decision. See 750 ILCS 5/503(d)(5), (8), (11) (West 2018)).

¶ 55 In sum, while the circuit court's comments in open court admittedly focused on contribution with respect to the Matteson property, this was an appropriate and relevant factor, and

19

Sonya makes no positive showing from the record that the court failed to consider the other relevant statutory factors when distributing the entirety of the marital assets (excepting the checking accounts issue). As such, while reasonable minds may disagree with the court's distribution, including the Matteson property, the distribution was not counter to law, or contradicted by the record such that no reasonable person could have arrived at the court's conclusion, making reversal inappropriate. See *Dunseth*, 260 Ill. App. 3d at 831.

¶ 56    Finally, we note that Sonya makes a broad argument that the distribution was unfair based on an uneven (if disputed) percentage split of the assets. Sonya only substantively complains of the checking accounts and the Matteson property distribution, however, which we resolve above. Furthermore, regarding the fairness of the Matteson property distribution, it is worth repeating that a distributing court is not required to make an equal distribution and may award certain property to one spouse when there is support in the record for the award—support which is present because it was undisputed that Vernon made the down payment and the mortgage payments for the Matteson property. See *Henke,* 313 Ill. App. 3d at 175.

¶ 57                                    IV. CONCLUSION

¶ 58   The circuit court's findings regarding the Chicago Heights property, the dissipation claim until January 15, 2020, and the marital distribution aside from the checking accounts were proper. As such, we remand for the circuit court to reallocate the following assets equitably: the funds specific to the dissipation claims between 2020 and January 4, 2021, totaling $72,892.03, and the checking account assets, totaling $202,561.

¶ 59   Reversed in part and remanded for equitable reallocation of the specified marital assets.

¶ 60    JUSTICE TAILOR, concurring in part and dissenting in part:

¶ 61    I concur with the majority's decision to reverse the circuit court's finding with respect to dissipation and the checking accounts, but respectfully dissent from its decision to affirm the circuit court's findings regarding the Chicago Heights and Matteson properties.

¶ 62    The majority concludes that because Vernon testified that he inherited the Chicago Heights property from his father, the presumption that a transfer from parent to child is a gift cancels out the presumption that the property is marital because it was allegedly acquired during Vernon's marriage to Sonya. Even if these conflicting presumptions apply, the evidence presented does not support a finding that the Chicago Heights property was a gift.

¶ 63    The majority points to the fact that "the evidence did show the property was in Fred's trust in 2017" and concludes that this supports Vernon's contention that he inherited (or was gifted) the property from his father. However, the trust document, whereby Fred Reed, in his individual capacity, conveyed the Chicago Heights property to "Fred Reed, as Trustee of the Fred Reed 2017 trust[]" does no such thing. It makes no mention of Fred's intent to gift the property to Vernon after his death, nor does it mention Vernon at all. Vernon's lack of knowledge about the terms of his father's trust does not help him either. Vernon testified that he had "never seen his father's trust," had "never seen any documents related to his father's trust," and had "no documentation that showed he was awarded the property in his father's trust." Moreover, although Vernon testified that his brother was the trustee of his father's estate and "has all of the trust documents," he failed to produce these documents or have his brother testify at trial. See *Johnson v. Owens-Corning Fiberglas Corp.,* 233 Ill. App. 3d 425, 437 (1992) ("Where a witness who has knowledge of the facts and is accessible to a party is not called by a party, a presumption arises that his testimony would be adverse to that party").

¶ 64     In addition, the majority points to the fact that Vernon "lived [in the Chicago Heights property] during the separation" and concludes that this "constituted evidence *** needed to establish the property transfer was a gift, *i.e.,* donative intent and finality of transfer[.]" However, "[m]ere possession by one claiming property as a gift, after death of the owner, is universally, we believe, held insufficient to prove a valid gift." *Rothwell v. Taylor,* 303 Ill. 226, 230 (1922); *Pocius v. Fleck*, 13 Ill. 2d 420, 428 (1958) ("gifts first asserted after the death of the donor are regarded with suspicion"). Instead, "it is essential to prove the delivery of the property by the donor to the donee, with the intent to pass the title to the donee absolutely and irrevocably." *Id.* at 427. See, *e.g., In re Marriage of Blunda*, 299 Ill. App. 3d 855, 867 (1998) (finding the evidence sufficient to prove that the transfer of shares of stock were a gift from the wife's father when the father filed a gift tax return and testimony in the record established that the stock was a gift).

¶ 65     Here, by contrast, Vernon provided no proof of transfer or of donative intent other than his testimony that he inherited the property from his father. Compare with *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 54 (finding that the evidence supported a finding that stock a son received from his father was a gift and therefore constituted nonmarital property because the father testified that "intended to give [his son] the shares as a gift" and gift tax returns were admitted into evidence, providing proof of "absolute and irrevocable delivery."). In his brief, Vernon admits that "the evidence does not show any ownership of the property by Vernon Reed individually." The majority acknowledges the same yet concludes that the "court's decision that the property was a nonmarital gift was not against the manifest weight of the evidence."

¶ 66     The circuit court's comments—"if in fact [Vernon] has an interest in [the Chicago Heights] property" and "to the extent that [Vernon] has any interest or acquired any interest in the trust or in the property"—evince its doubts about Vernon's ownership interest in the property, and

22

reinforce the conclusion that the evidence Vernon presented was insufficient to prove that the Chicago Heights property was a gift from his father. If Vernon could not convince the circuit court that the Chicago Heights property was transferred to him, then by definition the circuit court could not reasonably conclude that Vernon acquired ownership of the property through gift or inheritance.

¶ 67     For the reasons above, I disagree with the majority and find that the circuit court's decision to classify the Chicago Heights property as nonmarital was against the manifest weight of the evidence. Although it is unclear from the record who actually owns the Chicago Heights property, Vernon asserts that he does, so I would reverse the circuit court's classification of the property as nonmarital, reclassify the property as marital, and instruct the circuit court to equitably divide the value of the property between Sonya and Vernon on remand.

¶ 68     I also disagree with the majority's conclusion that the court's decision to award the Matteson property solely to Vernon was not improper. While the distribution of marital assets is within the trial court's discretion, this discretion is not unlimited. "A division of property must be reasonable and must meet the statute's objectives." *In re Marriage of Agazim,* 176 Ill. App. 3d 225, 231 (1988). Section 503(d) of the Act directs the trial court to divide marital property in just proportions after considering twelve relevant factors. 750 ILCS 5/503(d). These factors include each party's contribution "to the acquisition, preservation, or increase or decrease in value of the marital *** property," the "dissipation by each party of the marital *** property," the length of the marriage, the value of the property assigned to each spouse, the "relevant economic circumstances of each spouse when the division of property is to become effective," the "age, health, station, occupation, amount and sources of income, vocational skills, employability *** and needs of each of the parties," and the "reasonable opportunity of each spouse for future

acquisition of capital assets and income." 750 ILCS 5/503(d)(1)-(12). "The touchstone of apportionment of marital property is whether the distribution is equitable in nature." *In re Marriage of Tietz,* 238 Ill. App. 3d 965, 979 (1992); *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34.

¶ 69    Here, it was undisputed that the Matteson property, in which the parties had equity of approximately $170,000, was marital property. Nevertheless, the court awarded the property solely to Vernon. The court seemed to base its decision almost exclusively upon the financial contributions of each party to the property, noting that Vernon had paid all of the mortgage and insurance payments on the property and concluding that Sonya's contributions to the property were "minimal." However, this finding—that Sonya's contributions were "minimal"—ignores the fact that Sonya contributed $1200 per month to the household expenses, an amount that exceeded the amount Vernon paid each month toward the mortgage. Moreover, even assuming that Vernon's financial contributions to the household were greater than Sonya's, "a spouse's greater financial contributions do not necessarily entitle him or her to a greater share of the marital assets." *In re Marriage of Scoville*, 233 Ill. App. 3d 746, 758 (1992). Instead, a party's "financial contribution to the acquisition of marital assets is only one of several factors to be considered by the trial court in determining the equitable distribution of marital assets." *In re Marriage of Lee*, 246 Ill. App. 3d 629, 638 (1993).

¶ 70    The circuit court's decision to award the entirety of the Matteson property to Vernon fails to account for many of the other statutory factors when dividing marital property, including the length of the parties' marriage, the needs of the parties, their economic circumstances, and the value of other property assigned to each party. The majority contends that "the circuit court considered myriad factors outside of the parties' contribution to the Matteson property in

24

distributing the assets" because it "responded to a question regarding the distribution of the equity in the Matteson property by stating it balanced not awarding equity by awarding [Sonya] attorney's fees." But Sonya owed more than $30,000 in legal fees and Vernon was ordered to contribute only $10,000 towards those fees, an amount well short of the $85,000 Sonya would have received if the Matteson property had been equally divided between her and Vernon. The majority also attempts to justify the circuit court's decision to award the entirety of the Matteson property to Vernon by stating that the "court weighed Sonya's ability to make her own living and procure assets in the future based on her status as an attorney." However, although Sonya was employed as an attorney at the time of the divorce, Vernon's income was still greater than hers. Sonya was earning $88,500 annually as an attorney, whereas Vernon was earning approximately $100,000 per year.

¶ 71    Other factors weigh in favor of a more equitable division of the Matteson property as well. First, Sonya and Vernon were married for 11 years. Second, Sonya was employed as a staff attorney for the majority of her marriage to Vernon, and during this time, she made financial contributions towards their home, which covered property insurance, utilities, food, and other household expenses. Third, at the time of their divorce, Sonya owned no other property, whereas Vernon owned another property from which he derived rental income. Finally, Sonya still owed more than $20,000 in law school debt. Although a trial court need not make express findings regarding each factor on the record, it still must consider them. As the majority acknowledges above, *supra* ¶ 42, "[e]qual distribution of marital property is generally favored, unless application of the statutory factors demonstrates an equal division would be inequitable." *In re Marriage of Minear*, 287 Ill. App. 3d 1073, 1083 (1997).

¶ 72    When the statutory factors are considered as a whole, I find that the circuit court abused its discretion when it awarded the entirety of the Matteson property to Vernon. This lopsided award

is unreasonable and fails to meet the objectives of the statute. *Agazim,* 176 Ill. App. 3d at 231; *Tietz,* 238 Ill. App. 3d at 979 ("The touchstone of apportionment of marital property is whether the distribution is equitable in nature.") Accordingly, I would reverse the circuit court's decision to award the Matteson property to Vernon and split the value of the property equally between the parties on remand.